**In re Phillip G. SNYDER, dba Phillip Snyder Realty, and Real America/Better Homes and Gardens, Debtor.**

**Bankruptcy No. 82C–02235.**

United States Bankruptcy Court,
D. Utah.

July 25, 1985.

B. Ray Zoll and Tom D. Branch, Offret, Zoll & Hammond, Salt Lake City, Utah, for debtor.

Thomas T. Billings and Carolyn Montgomery, Van Cott, Bagley, Cornwall & McCarthy, Salt Lake City, Utah, for trustee, Main Hurdman.

William G. Fowler and Joel R. Dangerfield, Roe, Fowler & Moxley, Salt Lake City, Utah, for creditors' committee.

## MEMORANDUM OPINION

GLEN E. CLARK, Bankruptcy Judge.

### PRELIMINARY FACTS AND PROCEDURAL BACKGROUND

On September 2, 1982, an involuntary Chapter 7 petition was filed against the debtor, Phillip G. Snyder, by 18 petitioning creditors. On December 22, the debtor stipulated to entry of an order for relief, and on January 26, 1983 exercised his right to convert the case to a case under Chapter 11 of the Bankruptcy Code. At the time the bankruptcy case was commenced, the debtor was engaged in the business of real estate development and sales.

On July 20, 1983, on motion of the creditors' committee and after a hearing, the Court appointed the accounting firm of Main Hurdman as trustee.

On March 19, 1984, the trustee, through its counsel, filed with this Court a verified application for an order to show cause why the debtor and his attorney should not be adjudged in civil contempt of court for engaging in activities which the trustee characterized as an unauthorized solicitation of votes for a plan of reorganization in violation of the provisions of Section 1125(b) of the Bankruptcy Code, and for communicating directly with parties represented by attorneys in violation of the Code of Professional Responsibility.

An order to show cause was issued by the Court and a hearing thereon was set for May 9, 1984. At the hearing, the Court ruled from the bench as follows:

With respect to the 1125(b) issue, ... there appear to be two competing policies which clash here: One is the clear intention of the Code to encourage negotiations. The other is the clear intention of the Code to protect people from misrepresentation and to have approval of disclosure statements by the Court.

*　　*　　*　　*　　*　　*

[T]here may be a need for this Court to clearly define where the line is, ... I would ask counsel to attempt to research this matter more thoroughly and brief it for the benefit of the Court.

The Court has reviewed the post-hearing briefs of the parties and has considered the evidence presented and the statements and arguments of counsel and upon its own analysis of the applicable authorities, renders its decision as follows.

### FINDINGS OF FACT

On or about February 22, 1984, without prior notice to creditors, the trustee, the creditors' committee or their attorneys, the debtor and his counsel prepared and disseminated a communication to all creditors in the case.

This communication consisted of a cover letter from the debtor's attorney addressed to each creditor proposing to "more effectively handle [the] bankruptcy by following one of five plans" and dismissing the case.[1] Creditors were invited to send their comments on the various plans to the debtor's attorney.

The communication also included a letter, sent to all creditors on the mailing matrix, that was addressed to the creditors' committee, entitled "Proposal to Settle and Compromise Claims" which stated: "We are making this proposal in an attempt to take a practical and economic approach to this case to pay all creditors the highest possible amount." It further stated that a meeting "with the creditor's [sic] committee and all creditors who would like to attend" would be held on "the 21st day of March, 1984, at 12:00 p.m. at our offices. In that meeting we will discuss in detail our proposal and hopefully come to some understanding of our differences."[2] To these letters were attached exhibits con-

---

1. The letter reads in full as follows:

Dear Creditor:

Please read carefully this letter. It is a proposal to the creditors committee and all creditors to more effectively handle this bankruptcy by following one of five plans and dismissing it. We believe one of these five plans would greatly expedite [sic] and make the greatest remuneration to all.

Exhibit A includes articles about the Heritage Resort which is right next to the Foothill property owned by the Debtor and should increase dramatically [sic] over the next several months. It would be a loss for all to sell the property for half its value by a "fire sale".

A BREAKDOWN OF EACH PLAN IS LOCATED ON THE LAST 2 PAGES OF THIS PACKAGE. PLEASE REVIEW.

Please write the above entitled law office with your comments and preference of one of the five proposals.

We look forward to hearing from every one of you as it is IMPORTANT for our determination of what steps we can take to help solve a very difficult situation [sic].

Very truly yours,
/s/ B. Ray Zoll

2. The letter outlined five alternative plans, as follows:

The plan of reorganization that will be submitted by Mr. Snyder, notwithstanding whatever is proposed by the trustee, will include the development of the Foothill property (which Mr. Snyder believes has good value). In the event that the Foothill property is developed it could result in a profit of between $1.240 Million and $2.758 Million with a 100%, or more, return to the creditors ([S]ee attached Plans 4 and 5).

We realize that some of the creditors may not want Phillip Snyder involved in the management, construction and development of that project due to the strained feelings that have occurred to date. Therefore, we suggest one of the following alternatives to pay out unsecured creditors:

1. Phillip Snyder return to possession of the estate and develop the property through another development company, specifically Maughan Brothers. ( [S]ee Plans 4 and 5 attached hereto which would result in a 142% and 317% payout respectively)[.]

2. The unsecured creditors hire their own developer/contractor and develop the Foothill project. ( [S]ee Plans 4 and 5)[.]

taining appraisals and values of the debtor's real property, the debtor's estimates as to costs of development and potential profits, numerous newspaper articles concerning the "Heritage Mountain" project in Utah County (a proposed resort adjacent to the debtor's property), and various payout provisions for secured and unsecured creditors as these provisions related to each of five "plans" proposed by the debtor.

Upon receipt of the communication, counsel for the creditors' committee immediately notified all creditors that the committee considered the communication to be factually misleading in numerous particulars, and a violation of 11 U.S.C. § 1125, and

further advised them to ignore the communication.[3] The trustee's attorney and the attorney for the creditors' committee advised the debtor's attorney that in their view both the communication and the scheduled meeting violated the law. Thereafter, the debtor's attorney again wrote to all creditors, suggesting that they ignore the creditors' committee's advice. This letter stated the prior communication was not a solicitation of votes but was merely a request for information and input from creditors to assist in the formulation of a plan.[4]

A meeting between the debtor, his counsel, and various creditors was held on

3. Liquidate the project as per the trustee's current desires under the trustee's current distressed sale offer of approximately $400,000.00 (see Plan 1 attached) which would result in a 14% payout to creditors.

4. The Foothill property be sold within six months to the highest bidder, which would result in a percentage payout to creditors of 45% (even based on the old 1981 appraisal see Plan 2 attached hereto)[.]

5. The Heritage Mountain Resort is contiguous on both sides of the Foothill property thereby substantialy [sic] increasing its values and is on the verge of beginning construction (see articles attached as Exhibit A). Plan 3 provides a 97% payout to creditors based upon an appraisal of $1.1 Million which could require a longer selling period to find an able buyer.

6. Regardless of which plan is utilized as described above, secured creditors are to be paid out according to their secured interest from other existing property of Phillip Snyder, as outlined in Exhibit B attached hereto.

7. Upon an agreement of any of the proposals described above, the bankruptcy proceeding would be dismissed, together with the dismissal of the following lawsuits:
a. Browning, et al. vs. Snyder et. al.
b. Counterclaim by Snyder in Browning case[.]
c. Withdrawal of personal complaints filed with the office of the Utah County Attorney.
d. Any other related complaint against Snyder whether filed or to be filed and full release of liability except as described in an agreement outlining one of the proposals above.

3. The letter from the attorney for the creditors' committee stated:

You and other creditors have received a letter from Phillip Snyder's attorney, B. Ray Zoll, dated February 22, 1984, soliciting support from unsecured creditors for a plan of reorganization pursuant to which the bank-

ruptcy case and certain pending civil and criminal proceedings against the debtor would be dismissed. The Bankruptcy Code prohibits the solicitation of acceptances of a plan of reorganization unless the court has previously approved a disclosure statement as containing adequate information.

The purpose of a court-approved disclosure statement is to provide creditors with reliable factual information from which to make an informed judgment about the viability of a plan of reorganization and the financial consequences of an acceptance or rejection thereof. In my view, the letter is an unlawful and unauthorized solicitation of acceptance of a plan of reorganization.

The trustee has initiated proceedings to adjudge Phillip G. Snyder and his attorney in contempt for disseminating the solicitation letter. I strongly urge you to disregard the letter.

Letter from Joel R. Dangerfield, attorney for the creditors' committee, to creditors of Phillip G. Snyder (March 21, 1984).

4. In pertinent part, the letter stated:

You received a letter of March 21, 1984, from Joel Dangerfield which must be explained and further clarified. Mr. Dangerfield and Ms. Montgomery have decided to take the position that the letter we sent to all creditors to help us gain and [sic] insight from creditors was the soliciting of an offer of acceptance of a plan. As I have explained numerous times to each of those parties, the Bankruptcy Code does not prevent my client from speaking and discussing proposals to creditors of the estate. Neither myself nor my client has ever solicited an offer for a plan of reorganization because we have not formulated a plan of reorganization but merely are looking at input regarding proposals we are considering to reduce to a plan. Furthermore, we have not solicited offers for any of

March 21, 1984, at 12:00 noon, pursuant to the notice in the communication. At that meeting, the trustee and counsel for the creditors' committee advised the group that they considered the debtor's written communication and the meeting itself to constitute a violation of the law. No formal acceptances or rejections of any plan were ever requested, either in the communication or at the meeting.

## DISCUSSION

The controlling provision of the Bankruptcy Code is § 1125(b), which provides:

(b) An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets.

Section 1125 is a new provision. It extends the disclosure requirements previously confined to railroad reorganizations and Chapter X cases to all reorganization cases.

S.Rep. No. 95–989, 95th Cong., 2d Sess. 120 (1978), 1978 U.S. Code Cong. & Admin. News, p. 5906. Section 1125(b) is derived in part from Section 176 of the Bankruptcy Act, former 11 U.S.C. § 576 (repealed),[5] and former Bankruptcy Rule 10–304.[6] Those provisions prohibited solicitation of acceptances or rejections of a plan until after entry of an order by the court approving the plan. Generally, the sanction for unauthorized solicitation was invalidation of the wrongfully procured acceptance.[7] *See* 6 pt. 2 COLLIER ON BANKRUPTCY ¶ 7.39, at 1323–1328 (14th ed. 1978).

The terms "solicit" and "solicitation," as used in § 1125(b) of the Code, are not defined in the Code or in its legislative history. However, the Senate Report implies that the term "solicitation" should be given a narrow interpretation when it states that "[s]olicitations with respect to a plan do not involve just mere requests for opinions." S.Rep. No. 95–989, 95th Cong., 2d Sess., 121 (1978), 1978 U.S. Code Cong. & Admin. News, p. 5907. The terms also appear in Bankruptcy Rule 2006, which applies to Chapter 7 cases and is incorporated by reference in Rule 2007, which applies to cases under Chapters 9 and 11. As used in Rule 2006, the term "solicitation," as it applies to the solicitation of proxies, means "any communication ... by which a credi-

---

the proposals we submitted, but have merely requested information from the creditors so I can expedite matters in determining whether or not creditors are interested in some of our ideas. Obviously, we will prepare a formal plan of reorganization and a disclosure statement within the rules once we decide what plan we would like to try to gain approval from the court on.
Letter from B. Ray Zoll, attorney for the debtor, to creditors of Phillip G. Snyder (March 26, 1984).

5. Section 176 provided:
No person shall, without the consent of the court, solicit any acceptance, conditional or unconditional, of any plan, or any authority, conditional or unconditional, to accept any plan, whether by proxy, deposit, power of attorney or otherwise, until after the entry of an order approving such plan and the transmittal thereof to the creditors and stockholders, as provided in section 575 of this title;

and any such authority or acceptance given, procured, or received by reason of a solicitation prior to such approval and transmittal shall be invalid, unless such consent of the court has been so obtained.

6. Bankruptcy Rule 10–304 provided:
No person shall, without the consent of the court, solicit any acceptance or rejection, conditional or unconditional, of any plan, whether by proxy, deposit, power of attorney or otherwise, until after the entry of an order approving such plan pursuant to Rule 10–303(c) and the transmittal thereof to creditors and stockholders pursuant to Rule 10–303(e). Rule 10–211(b) applies to any violation of this rule.

7. Former Bankruptcy Rule 10–211(b) provided that "[t]he court on its own initiative or motion of any party in interest ... (3) may hold invalid any authority or acceptance given, procured, or received by a person or committee who has not complied with ... Rule 10–304."

tor is asked, directly or indirectly, to give a proxy. ..."

■ The terms "solicit" and "solicitation," as used in § 1125(b) of the Code, must be interpreted very narrowly to refer only to a specific request for an official vote either accepting or rejecting a plan of reorganization. The terms do not encompass discussions, exchanges of information, negotiations, or tentative arrangements that may be made by the various parties in interest in a bankruptcy case which may lead to the development of a disclosure statement or plan of reorganization, or information to be included therein. If these activities were prohibited by Section 1125(b), meaningful creditor participation in Chapter 11 cases would cease to exist. It follows that an unauthorized "solicitation" would include a specific request for an official vote for or against a plan of reorganization (a) that is made before dissemination to parties in interest of an approved disclosure statement, or (b) that is made after the dissemination of a disclosure statement, and which contains misrepresentations or deliberate falsehoods and misleading statements calculated to deceive parties entitled to vote, or (c) that refers to a plan of reorganization predicated upon arrangements that were arrived at by fraud or that were not adequately disclosed to the court and to parties in interest in the approved disclosure statement.

■ On the basis of the evidence before it, the Court holds that the activities of the

debtor and his attorney which led to and included the mailing of the February 22, 1984 communication, and the March 21, 1984 meeting, did not constitute a specific request for official votes either accepting or rejecting a plan of reorganization and, therefore, did not constitute an unauthorized solicitation as defined herein and as prohibited by § 1125(b) of the Code.[8]

■ Turning next to the question of whether dissemination of the materials by the debtor's attorney constitutes an impermissible contact with an opposing party represented by counsel, it is clear that the debtor's attorney did make direct contact with one or more creditors whom the debtor's attorney knew or should have known were represented by counsel. It was nevertheless argued by counsel for the debtor that such direct communication with parties in interest is contemplated by the Bankruptcy Code as a necessary aspect of the plan negotiation process. Counsel for the debtor has not cited a single case or other authority in support of his position.

■ Direct contact by an attorney with a party in interest without first obtaining the permission of their attorneys is a violation of the Code of Professional Responsibility governing attorneys practicing in Utah and before this Court. The specific provision dealing with impermissible contacts is Disciplinary Rule 7–104, which provides:

(A) During the course of his representation of a client a lawyer shall not:

**8.** The Court was not called upon to decide, and shall refrain from deciding, whether the materials disseminated among creditors by the debtor and his attorney were materially misleading and whether the Court, in the exercise of its equitable powers, could have enjoined their distribution or remedied a deception upon creditors by means of an affirmative disclosure at their expense and in a form approved by the trustee. *See, In re Sixth & Wisconsin Tower, Inc.,* 108 F.2d 538 (7th Cir.1939) (in absence of order or rule enjoining circulation of letter critical of plan, such conduct could not be punished as contempt); *In re Schroeder Hotel Co.,* 86 F.2d 491 (7th Cir.1936), noted in 46 Yale L.J. 1391–97 (1937); *In re Portland Electric Power Co.,* 97 F.Supp. 903 (D.Ore.1947) (indenture trustee found in contempt for disseminating without court approval letter criticizing plan for the purpose of influencing votes of bondholders); *Matter of W.T. Grant Company,* 6 B.R. 762 (Bkrtcy.S.D.N.Y.1980) (dissemination of seriously misleading letter relating to proposed compromise and settlement enjoined). *Cf. Matter of National Service Corp.,* 742 F.2d 859 (5th Cir. 1984) (bankruptcy judge's order prohibiting advertising agency from posting billboards with message that debtor was bankrupt and could not pay its bills was an impermissible prior restraint of free speech); *Cf. Application of Realty Associates Securities Corp.,* 59 F.Supp. 90 (E.D.N.Y.1944) (court was without discretion to enjoin dissemination of booklet outlining proposed plan).

(1) Communicate or cause another to communicate on the subject of the representation with a party he knows to be represented by a lawyer in that matter unless he has the prior consent of the lawyer representing such other party or is authorized by law to do so.[9]

■ Under DR7–104(A)(1) a lawyer is prohibited from negotiating a settlement directly with the opposing party. *Turner v. State Bar*, 36 Cal.2d 155, 222 P.2d 857 (1950); *In re Atwell*, 232 Mo.App. 186, 115 S.W.2d 527 (1938). The prohibition against communication with a person known to be represented by another lawyer without that lawyer's consent is intended to prevent overreaching by attorneys, and is necessary to the preservation of the attorney-client relationship. The rule shields the opposing party from a lawyer's intentional and knowing contacts, *Crane v. State Bar*, 30 Cal.3d 117, 635 P.2d 163, 177 Cal.Rptr. 670 (1981), and against misguided but well-intentioned communications, *Abeles v. State Bar*, 9 Cal.3d 603, 510 P.2d 719, 108 Cal.Rptr. 359 (1973), as well as against negligently made communications. *In re McCaffrey*, 275 Or. 23, 549 P.2d 666 (1976). *See generally Annot.*, "Communication with Party Represented by Counsel as Ground for Disciplining Attorney," 26 A.L.R.4th 102 (1983); *Annot.*, "Attorney's Dealing Directly with Client of Another Attorney as Ground for Disciplinary Proceeding," 1 A.L.R.3d 1113 (1965). This provision is to be construed literally and does not allow a communication with an opposing party, without the consent of counsel, even though the purpose is merely to investigate the facts. *See In re Schwabe*, 242 Or. 169, 408 P.2d 922 (1965).

■ Counsel have not invited the Court's attention to any case applying DR7–104(A)(1) to communications between a debtor's attorney and creditors or members of a creditors' committee in a bankruptcy case, and the Court has found none. However, it is clear beyond question that the Code of Professional Responsibility applies to bankruptcy cases and proceedings. *See In re Roberts*, 46 B.R. 815, 830–33 (Bkrtcy. D.Utah 1985).[10]

The creditors' committee appointed under Section 1102(a)(1) is the unsecured creditors' primary negotiating body for the formulation of a plan of reorganization. 11 U.S.C. § 1103(c); H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 401 (1977), 1978 U.S. Code Cong. & Admin. News, p. 6357. *Cf.* Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 93–137, 93d Cong., 1st Sess., Pt. II at 184–85 (1973). An active creditors' committee usually employs an attorney, and the attorney becomes its representative and spokesman in negotiations concerning the plan. The committee also oversees and supervises, to some extent, the debtor's conduct of the case. *Id. See Bohack Corp. v. Gulf & Western Industries, Inc.*, 607 F.2d 258, 262 n. 4 (2d Cir.1979). The committee, and the creditors it represents, will often, as in this case, find itself in an adversarial relationship with the debtor.

■ Communication with creditors regarding a proposed plan of reorganization is analagous to communicating with an ad-

---

**9.** On August 2, 1983, the House of Delegates of the American Bar Association voted to adopt new Model Rules of Professional Conduct to ·supersede the former ABA Model Code of Professional Responsibility. New Rule 4.2, which is substantially identical to DR7–104(A)(1), provides:

COMMUNICATION WITH PERSON REPRESENTED BY COUNSEL

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

**10.** *Cf.* Ethics Opinion 82–61, Committee on Ethics of the Maryland State Bar Association (May 17, 1982) (the prohibition on contacting persons represented by counsel does not bar a lawyer appointed as a trustee in a bankruptcy case from sending a letter directly to the debtor requesting financial information unless the lawyer has also been authorized to act as his own attorney).

verse party regarding settlement. In each case, the ethical canons require the prior consent from the communicant's attorney. Where the creditors' committee has employed an attorney pursuant to 11 U.S.C. § 1103(a), this Court holds that the debtor may not communicate with members of the committee without the prior consent of the committee's attorney or an order of the Court. The debtor's attorney is also precluded from communicating with individual creditors without obtaining the prior consent of their respective attorneys.[11]

It appears to the Court that the conduct of the debtor's attorney, albeit misguided, was the product of overzealousness in serving his client's interests, rather than enmity towards the trustee and the creditors' committee and their respective counsel, or contempt for the rules of professional conduct. In view of the fact that the issue decided today is one of first impression, the Court will not require the debtor's attorney to bear the costs and expenses of this proceeding. It would seem appropriate, however, to reprimand the debtor's attorney for his misconduct and for this memorandum opinion to stand as that reprimand.

### CONCLUSION

From the factual findings, as set forth above, this Court is of the opinion that the written communication with creditors was not an unlawful solicitation of acceptances of a plan of reorganization. Dissemination of the material without the prior approval of the attorney for the creditors' committee or the attorneys for individual creditors violated DR7–104(A)(1) and the debtor's attorney has been reprimanded.

An order shall be entered consistent with this opinion.

---

**11.** This holding does not require the debtor's attorney to obtain permission from the attorney for the creditors' committee or from attorneys for individual creditors in order to disseminate an approved disclosure statement, a plan of reorganization, or ballots for acceptance or rejection thereof, because these are communications "authorized by law" and specifically excepted by DR7–104(A)(1).