846 F.2d 803
 Bankr. L. Rep. P 72,304
PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, Plaintiff, Appellee,
v.
CONSOLIDATED UTILITIES AND COMMUNICATIONS, INC., Defendant,
Appellant.
PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE, Plaintiff, Appellee,
v.
CONSOLIDATED UTILITIES AND COMMUNICATIONS, INC., et al.,
Defendants, Appellees,
First Fidelity Bank, N.A., Defendant, Appellant.
 Nos. 88-1068, 88-1069.
 United States Court of Appeals,
First Circuit.
 Heard March 10, 1988.
Decided May 13, 1988.
 
 Robert S. Smith, with whom Audrey S. Feinberg, Maria H. Bainor, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Wilfred L. Sanders, Jr., Lawrence M. Edelman and Sanders & McDermott, P.A., Hampton, N.H., were on brief, for Consol. Utilities and Communications, Inc.
 John F. Pritchard, with whom Sutton Keany, Keith M. Merriwether, III, Ann Halan, Winthrop, Stimson, Putnam & Roberts, New York City, Lawrence S. Smith and Ransmeir & Spellman, Concord, were on brief, for appellant First Fidelity Bank, N.A.
 Gregory A. Holmes and Wiggin & Nourie, Manchester, on brief, for Amoskeag Bank, amicus curiae.
 Thomas R. Jones, with whom Jerome Sheinman, Bohdan Vitvitsky, Geoffrey E. Liebmann, Cahill Gordon & Reindel, New York City, Warren C. Nighswander and Sulloway Hollis & Soden, Concord, were on brief, for appellee Public Service Co. of New Hampshire.
 Before CAMPBELL, Chief Judge, WISDOM,* Senior Circuit Judge, and BOWNES, Circuit Judge.
 BOWNES, Circuit Judge.
 
 
 1
 This case grows out of the financial trouble besetting Seabrook Nuclear Power Plant (Seabrook) in Seabrook, New Hampshire. On appeal, defendants-appellants Consolidated Utilities and Communication, Inc. (CUC), and First Fidelity Bank, N.A. (Fidelity) challenge two preliminary injunctive orders issued by the United States District Court for the District of New Hampshire in favor of plaintiff-appellee Public Service Company of New Hampshire (PSNH), one of Seabrook's principal owners. The first order, issued on December 4, 1987, enjoined the defendants from convening a meeting of bondholders on December 9, 1987. The second, more detailed order, issued on December 11, 1987, enjoined the defendants from attempting to hold a meeting similar to the one planned for December 9, and further prohibited them from soliciting proxies relating to PSNH securities until the defendants had complied with the requirements of section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78n(a), and the regulations thereunder, 17 C.F.R. Sec. 240.14a (1987). On January 28, 1988, while the appeal from these orders was pending, PSNH filed for protection from its creditors under Chapter 11 of the Bankruptcy Code. We find that this bankruptcy filing has rendered moot the issues raised on appeal.I.
 
 
 2
 CUC is a Delaware corporation which specializes in investing in public utilities. With other "unnamed holders," it controls a substantial percentage of PSNH's third mortgage bonds.[1] Fidelity is the trustee for PSNH's third mortgage bondholders. PSNH, as is well-known, is one of a number of companies involved in the construction of Seabrook. Although PSNH now owns over one-third of Seabrook, it cannot recover any part of its investment from New Hampshire taxpayers until the plant provides services to customers. See N.H.Rev.Stat.Ann. Sec. 378:30a (1984). This inability to collect reimbursement has had severe ramifications: as the district court stated, "[i]t is no secret that PSNH has financial problems." PSNH itself predicted at one point that until Seabrook became operational, the utility company would continue to incur cash expenditures of $4 million per month.
 
 
 3
 On September 18, 1987, in an effort to stave off bankruptcy, PSNH proposed a reorganization plan (PSNH Plan). The Plan had several components. First, PSNH promised to petition the New Hampshire Public Utilities Commission for an emergency rate increase of fifteen percent.[2] Second, PSNH indicated that it would implement cash conservation measures to reduce its capital and operational expenditures. And finally, PSNH asserted that it would attempt to restructure the company's debt through voluntary "exchange offers" with its creditors. The "exchange offers," put simply, would effect a kind of refinancing, by which PSNH would issue new securities that would not require the payment of interest for several years in exchange for the interest-bearing securities that the creditors currently held.
 
 
 4
 On September 22, 1987, CUC responded to the PSNH Plan by announcing its own, alternative, plan (CUC Plan). The CUC Plan called for a three-year base rate freeze, a spin-off to a separate company of PSNH's interest in Seabrook, and the conversion of third mortgage debt and unsecured debentures into stock in a reorganized PSNH and a new (and separate) company, "Seabrook, Inc."
 
 
 5
 In an action filed in district court on November 25, 1987, PSNH alleged that "[f]or the past two months, CUC ha[d] engaged in a constant campaign of solicitation designed to culminate in a refusal by security holders to adopt [the] PSNH plan, and instead to exercise rights in favor of the CUC takeover," a central component of which was the CUC Plan. PSNH claimed in particular that by denigrating the PSNH Plan while advocating the alternative CUC Plan, both CUC and Fidelity had solicited proxies "relating to PSNH securities" in violation of section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78n(a).[3] PSNH also claimed damages on the ground that CUC's statements constituted trade libel, in violation of N.H.Rev.Stat.Ann. ch. 358-A (1984).
 
 
 6
 PSNH identified two forms of "solicitation." First, it pointed to the extensive commentary by CUC to the press, in which CUC touted its own plan and attacked the PSNH Plan. Typical of these comments was that appearing in the September 21, 1987 issue of the Wall Street Journal: the chairman of the board of CUC, Martin Whitman, said that the PSNH Plan was "dead in the water" and that he would present "an alternative plan to Public Service" that day. Whitman continued to advocate this "alternative plan" over the next few months, calling it a proposal that "offer[ed] immediate stabilization and a permanent solution to (the utility's) financial problems." On November 12, 1987, CUC made its strongest push for the CUC Plan by placing a full page advertisement in the Boston Globe. Entitled "An Open Letter to the Citizens of New Hampshire," it claimed that " 'In Financial Terms, PSNH is Broke.' They Want You To Bail Them Out. That's Not Fair." The advertisement went on to proclaim the benefits of the CUC Plan:
 
 
 7
 Our plan is fair to everyone-investors and ratepayers. [It] will: Freeze your electric rates for three years; Guarantee you high quality electric service; Prevent you from paying for Seabrook until it works.
 
 
 8
 It concluded with an exhortation to "get the facts" by calling the listed toll-free number for a free copy of the CUC Plan.
 
 
 9
 The second form of solicitation alleged by PSNH was a notice sent out by Fidelity in November at the bequest of CUC, in which CUC proposed discussing and voting on several issues at a bondholders meeting to take place on December 9, 1987.[4] Among those issues was the question of whether the bondholders should direct
 
 
 10
 the Trustee, ... to exchange "Senior Indebtedness" and "Subordinated Indebtedness," ... for tendered Bonds and unsecured debentures previously issued by the Company, which Exchange Offer would, if implemented, require the Trustee to authenticate additional bonds to secure such Senior Indebtedness and Subordinated Indebtedness and would, by creating such additional issue of bonds, ... place Bondholders who exchange their Bonds for Senior Indebtedness in a preferred position over Bondholders who do not exchange their Bonds, ... thereby adversely affecting the trusts created by the granting clause of the Indenture "for the equal pro rata benefit, security and protection" of the registered owners of the Bonds "without any preference, priority or distinction of any one Bond over any other Bond by reason of priority in the issue, sale or negotiation thereof....
 
 
 11
 (Emphasis added.) The "exchange offer" was an explicit reference to the PSNH Plan.
 
 
 12
 The court found that CUC's activities--both the media announcements and the notice to bondholders--constituted the "solicitation of proxies" within the meaning of section 14(a) of the Securities Exchange Act of 1934. It noted that proxy rule 14a-1 set forward by the Securities and Exchange Commission, defines a "proxy" to include "every proxy, consent or authorization...." 17 C.F.R. Sec. 240.14a-1 (1987). Under this same rule, "solicitation" means any "communication to security holders under circumstances reasonably calculated to result in the procurement, withholding or revocation of a proxy." Id. Finding that bondholders were "security holders" within the meaning of the Act, see 15 U.S.C. Sec. 78l (1982), the court held that "CUC's continuous plan of solicitation was designed to convince Third Mortgage Bondholders to withhold their consent to PSNH's plan while at the same time adopt[ing] the more economically feasible CUC plan." The court went on to conclude that CUC had violated proxy rule 14a-6 by embarking upon this campaign of proxy solicitation without first filing with the Securities and Exchange Commission the various disclosures specified under that rule.[5] Finally, the court declined to find that CUC's public statements, which CUC claimed addressed the general public of New Hampshire on a "matter of great public interest," were protected by the first amendment.
 
 
 13
 The court enjoined CUC and Fidelity "from convening the meeting of Third Mortgage Bond Holders scheduled for December 9, 1987." The court also prohibited these defendants "from further soliciting any proxies relating to PSNH securities until they have properly complied with the requirements of the Act...." Both CUC and Fidelity appealed from this order and from an earlier order also enjoining the December 9 meeting. The appeals were consolidated, and are now here on review.
 
 II.
 
 14
 At oral argument, we raised the concern that this appeal had become moot as a result of the bankruptcy filing. We therefore allowed the parties the opportunity to strengthen their rather weak protestations to the contrary by supplemental briefs. Again, the parties assert that the case remains "live" on appeal. PSNH contends that, without an affirmance of the district court's orders, CUC would "return to a program of solicitation and the effects of its violation of the Proxy Rules [would] continue." CUC and Fidelity argue for a reversal of these orders, claiming that anything but a decision on the merits would leave their clients in a state of uncertainty. CUC points out that "no securities lawyer can advise a client who is a creditor of a troubled public company that he may communicate his views on that company in any manner without filing a proxy statement." Fidelity asserts that "the entire financial community requires a ruling of this [c]ourt on the merits of this appeal in order to clarify its responsibilities when calling bondholder meetings."
 
 
 15
 We are at a loss to understand these arguments, except as thinly veiled attempts to elicit an advisory opinion from this court. Counsel are experienced and skillful advocates whom we assume understand the Article III mandate that prevents us from "clarifying" even very important legal questions absent a case or controversy. See Honig v. Doe, --- U.S. ----, 108 S.Ct. 592, 601, 98 L.Ed.2d 686 (1988).
 
 An issue becomes moot when
 
 16
 (1) it can be said with assurance that 'there is no reasonable expectation ...' that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.
 
 
 17
 County of Los Angeles v. Davis, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (citations omitted); see Berkshire Cablevision v. Burke, 773 F.2d 382 (1st Cir.1985) (applying Davis standard). To decide the question here, whether the bankruptcy filing has mooted the underlying controversy, we need to assess the situation of the parties on appeal in light of the standard set forth in Davis. First, we must determine whether there is a reasonable expectation of a recurring threat that, in the absence of the district court's orders, CUC and Fidelity will use media announcements and the notice of a bondholders meeting to promote the CUC Plan without first submitting the requisite disclosure papers to the Securities and Exchange Commission. See Berkshire Cablevision, 773 F.2d at 385. Second, we must decide whether the bankruptcy filing has completely eradicated the effects of this alleged proxy rule violation. Id. at 384. We will address each question in turn.
 
 
 18
 The first inquiry has two parts: is there a reasonable expectation that the alleged proxy violation will recur either while PSNH is in Chapter 11 proceedings or after (and if) PSNH has survived them? We find no reasonable expectation of a recurrence at either point in time.
 
 
 19
 While PSNH is in bankruptcy, the bankruptcy rules--and not the proxy rules--govern the behavior of parties soliciting support for plans of reorganization. Section 1125(b) of the Bankruptcy Code provides in relevant part that
 
 
 20
 [a]n acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.
 
 
 21
 11 U.S.C. Sec. 1125(b) (1982). And, proxy rule 14a-2 comports with this section of the Bankruptcy Code by providing in relevant part that proxy rules 14a-3 through 14a-13 do not apply to
 
 
 22
 [a]ny solicitation with respect to a plan of reorganization under Chapter 11 of the Bankruptcy Reform Act of 1978, as amended, if made after the entry of an order approving the written disclosure statement concerning a plan of reorganization pursuant to section 1125 of said Act and after, or concurrently with, the transmittal of such disclosure statement as required by section 1125 of said Act.
 
 
 23
 17 C.F.R. Sec. 240.14a-2(a)(4) (1987).
 
 
 24
 PSNH attempts to defy the rather obvious meaning of the above provisions by arguing that "at least until such time as a Section 1125 disclosure document is approved and distributed, the Proxy Rules govern...." But section 1125 itself prohibits any solicitation of support for plans of reorganization "after commencement of the case under [Chapter 11] " unless the party seeking support first obtains approval from the bankruptcy court of a written disclosure statement. (Emphasis added.) Moreover, the legislative history of this section demonstrates a congressional intent to relieve parties to a bankruptcy proceeding of the extensive disclosure requirements mandated under the proxy rules. Commenting on section 1125, the House Report noted that
 
 
 25
 [t]he bill permits the disclosure statement to be approved without the necessity for compliance with the very strict rules of ... Section 14 of the Securities Exchange Act of 1934.... Without such a provision, the court ... would be required in every case to require a full proxy statement or prospectus.... The cost of developing a prospectus or proxy statement for a large company often runs well over $1 million. That cost would be nearly prohibitive in a bankruptcy reorganization. In addition, the information normally required under section 14 may simply be unavailable, because of the condition of the debtor. Finally, court supervision of the contents of the disclosure statement will protect the public investor from any serious inadequacies in the disclosure statement.
 
 
 26
 5 Collier on Bankruptcy Sec. 1125.03 (15th ed. 1979) (quoting H.R.Rep. No. 595, 95th Cong., 1st Sess. 227-28 (1977)), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6187. Compare Greater Iowa Corp. v. McLendon, 378 F.2d 783, 795 (8th Cir.1967) (purpose of section 14(a) of the Securities Exchange Act of 1934 is "to provide full and honest disclosure") with Matter of Northwest Recreational Activities, Inc., 8 B.R. 10, 11 (Bankr. N.D.Ga.1980) ("thrust of [section] 1125 [of Chapter 11] is disclosure").
 
 
 27
 Section 1125, then, effects what Congress believed to be the best compromise between insuring the meaningful disclosure of financial information necessary to evaluate a plan of reorganization and allowing parties to that bankruptcy proceeding the greatest possible freedom in developing such a plan of reorganization. It would be contrary to the very purpose of section 1125 to find that the proxy rules govern the necessity for and adequacy of disclosure statements until the point at which the bankruptcy court actually approves a disclosure statement explicitly not governed by the proxy rules.[6] Cf. In Re Snyder, 51 B.R. 432, 437 (Bankr.D.Utah 1985) (holding that the term "solicit" in section 1125 must be interpreted very narrowly to insure meaningful creditor participation in Chapter 11 cases); accord First American Bank of New York v. Century Glove, Inc., 81 B.R. 274 (Bankr.D.Del.1988). Rather, Congress clearly intended for the bankruptcy rules to displace the proxy rules, at least with respect to solicitations concerning plans of reorganization, as soon as a party sought protection under Chapter 11. Therefore, while PSNH is in bankruptcy proceedings, there can be no "reasonable expectation"--indeed no expectation at all--that the alleged violation of section 14(a) of the Securities Exchange Act of 1934 will recur. Section 14(a) simply does not apply.
 
 
 28
 Neither is there a "reasonable expectation" that the alleged violation of section 14(a) will recur once the bankruptcy proceedings are over. In order for this to happen, a number of contingencies would have to take place: PSNH, having emerged from bankruptcy, would once again have to be on the verge of bankruptcy; CUC, one of PSNH's creditors, would have to propose a plan for reorganization in opposition to a plan put forward by PSNH; and CUC would have to promote this plan through media announcements and a notice to bondholders.
 
 
 29
 We find the possibility of this configuration of events occurring again to be nothing more than "remote and speculative." Preiser v. Newkirk, 422 U.S. 395, 403, 95 S.Ct. 2330, 2335, 45 L.Ed.2d 272 (1975); see Murphy v. Hunt, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982) (to avoid mootness, it is not sufficient to show a "mere physical or theoretical possibility," but rather a "reasonable expectation" or a "demonstrated probability" that the same controversy will recur involving the same complaining party). CUC's allegedly violative behavior is not a firm local or governmental policy. See Honig v. Doe, --- U.S. ----, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988); Hortensia de Allende v. Shultz, 845 F.2d 1111 (1st Cir.1988). Nor is it a state law. See Globe Newspaper Co. v. Superior Court, 457 U.S. 596, 102 S.Ct. 2613, 73 L.Ed.2d 248 (1982). It does not, "by its continuing and brooding presence, [cast] what may well be a substantial adverse effect on the interests of the petitioning parties." Super Tire Eng'g Co. v. McCorkle, 416 U.S. 115, 122, 94 S.Ct. 1694, 1698, 40 L.Ed.2d 1 (1974). The challenged behavior "rest[s] [instead] on the distant contingencies," id., of another imminent bankruptcy of PSNH and a particular reaction by CUC to it.
 
 
 30
 Finally, the bankruptcy filing has completely and irrevocably eradicated any negative effects on PSNH that the preliminary orders sought to prevent. PSNH viewed CUC's aggressive promotional campaign as part of a strategy to coerce PSNH into accepting the CUC Plan by presenting no alternative to it but bankruptcy. Yet PSNH filed for bankruptcy, and that filing has put the parties in a completely different posture. Now PSNH has a renewed opportunity to present and solicit support for its plan of reorganization.[7] And the preliminary orders restraining CUC have become irrelevant; with or without those orders, CUC can do no more--and no less--to promote its plan than the Bankruptcy Code allows. In short, regardless of the decision that this court might reach on the merits, the outcome of the bankruptcy proceeding would be the same. See DeFunis v. Odegaard, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (finding case challenging the admissions policy of law school moot, because regardless of the decision on the merits, the plaintiff would receive his diploma from the school). There is no "real and substantial controversy [here] admitting of specific relief...." Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937); cf. 13A C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure Sec. 3533.3 at 261 (1984) ("The essential question of all mootness problems is whether changes in the circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief.").
 
 
 31
 In another attempt at avoiding Article III, CUC implies that the continued existence of the damage claim "premised on the same theory" as the preliminary orders is sufficient to prevent this appeal from those orders from becoming moot, even if the orders themselves have become moot. It relies upon Hedberg v. State Farm Mutual Automobile Ins. Co., 350 F.2d 924 (8th Cir.1965). In Hedberg, the defendants, four insurance companies, alleged that the plaintiff, an insurance agent, had violated his agreement with the companies by continuing to solicit business from their policyholders after he had ceased his employment with them. The Court of Appeals for the Eighth Circuit affirmed the trial court's preliminary injunction, which enjoined the agent from such solicitation for one year from the issuance of the injunction, even though the injunction had expired by the time that the case was heard on appeal. Central to the court's reasoning was that the controversy concerned "not the validity of the injunction per se but, rather, the validity of the [contract] as to which the injunction issued...." Id. at 933. The court ruled that the latter was "by no means moot for the issue of damages flow[ed] directly from it and, indeed, [was] dependent upon it...." Id.
 
 
 32
 We have two responses to CUC's reliance upon Hedberg. First, CUC's argument fails to come within the Hedberg holding. PSNH's claim for damages in no way "flows directly" from, or is in the least "dependent" upon its claims for equitable relief. The damage claim arises under New Hampshire law and requires that PSNH establish common law trade libel; the claim for injunctive relief, by contrast, arises under the Securities Exchange Act of 1934, and requires that PSNH establish that CUC's activities constituted the "solicitation of proxies" under the Act. In short, the claims for damages and equitable relief are not "premised on the same theory."
 
 
 33
 Second, even if they were "premised on the same theory," the Supreme Court has made clear that the proper procedure for an appellate court to follow, when a claim for preliminary relief becomes moot, is to dismiss this claim while remanding the question of damages for a trial on the merits. See University of Texas v. Camenisch, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981); cf. Ellis v. Brotherhood of Railway, Airline & Steamship Clerks, Freight Handlers, Express & Station Employees, 466 U.S. 435, 104 S.Ct. 1883, 80 L.Ed.2d 428 (1984) (in appeal from trial court's grant of summary judgment in favor of petitioners, the claim for injunctive relief had become moot while the claim for damages kept the case "live"). On appeal, "[e]ach claim must stand or fall on its own." Taxpayers for the Animas-La Plata Referendum v. Animas-La Plata Water Conservancy District, 739 F.2d 1472, 1479 n. 2 (10th Cir.1984). We therefore reject CUC's argument that PSNH's claim for damages can "resurrect the moot claims for equitable relief." Id. PSNH may pursue its damage claim in the proper forum below.
 
 
 34
 Finally, CUC claims that it will be "stigmatized" by the district court's orders because CUC will have to disclose these orders in subsequent public filings before the Securities and Exchange Commission. CUC relies on In re Continental Mortgage Investors, 578 F.2d 872 (1st Cir.1978), a case in which we held that an appeal from a bankruptcy judge's adjudication of a party as "bankrupt" was not moot because that adjudication caused "actual prejudice" to the party in ongoing bankruptcy proceedings conducted by the same judge. Id. at 878. Our description of the case suggests the difference between it and the case at bar. Here, there is not "actual prejudice," nor any way in which the district court's orders can "affect the matter in issue," id. at 877, once we vacate the orders as moot. It is hard to imagine any but the most minimal "stigma" attaching to CUC before the Securities and Exchange Commission from the knowledge that at some point a district court entered orders against it, orders that were not only preliminary in nature, but rendered devoid of precedential effect on appeal. Our decision that the claim for equitable relief has become moot " 'deprives [the district court's] opinion[s] of precedential effect.' " Davis, 440 U.S. at 634 n. 6, 99 S.Ct. at 1384 n. 6 (quoting O'Connor v. Donaldson, 422 U.S. 563, 577-78 n. 12, 95 S.Ct. 2486, 2495 n. 12, 45 L.Ed.2d 396 (1975)).
 
 
 35
 The preliminary orders are vacated on the ground that the appeal is moot.
 
 
 
 *
 Of the Fifth Circuit, sitting by designation
 
 
 [1]
 CUC is comprised of three groups of owners: (1) Whitman, Heffernan, Rhein & Co., Inc., an investment banking firm; (2) principals of the investment group, Silver Screen Management, Inc.; and (3) unnamed partners of LeBoeuf, Lamb, Leiby & MacRae, a law firm. The "unnamed holders," referred to in the complaint as the "John-Does 1-100," are those holding at least ten percent in aggregate principal amount of the third mortgage bonds. These bonds include "Deferred Interest Third Mortgage Bonds, Series A," and "Third Mortgage Pollution Control Revenue Bonds, Series B." The unnamed holders were not served with the complaint
 
 
 [2]
 This filing necessitated a concomitant challenge to the constitutionality of New Hampshire's "anti-CWIP" law, which prohibits PSNH from charging customers for any of Seabrook's costs until the plant is operational. See N.H.Rev.Stat.Ann. Sec. 378.30a (1984). On January 26, 1988, the Supreme Court of New Hampshire upheld the constitutionality of the statute. See Petition of Public Service Company of New Hampshire, 539 A.2d 263 (N.H.1988)
 
 
 [3]
 Section 14(a) provides that
 [i]t shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 781 of this title.
 The "rules and regulations" set forth the filing and disclosure requirements for the solicitation of proxies. See 17 C.F.R. Sec. 240.14a-1 to -13 (1987).
 
 
 [4]
 Under the terms of the indenture between Fidelity and PSNH, Fidelity may call a bondholders meeting when requested to do so by holders of at least ten percent in aggregate principal amount of the bonds affected by the business to be submitted to the meeting
 
 
 [5]
 Proxy rule 14a-6 requires that
 [f]ive preliminary copies of the proxy statement and form of proxy and any other soliciting material to be furnished to security holders concurrently therewith shall be filed with the [Securities and Exchange] Commission at least 10 calender days prior to the date definitive copies of such material are first sent or given to security holders....
 
 
 [17]
 C.F.R. Sec. 240.14a-6 (1987) (emphasis added). PSNH also had alleged a violation of proxy rule 14a-9, which precludes solicitations using false or misleading statements. See 17 C.F.R. Sec. 240.14a-9 (1987). Having found a violation of proxy rule 14a-6, the court declined to address the claim premised upon a violation of proxy rule 14a-9
 
 
 [6]
 Section 1125(d) of Chapter 11 provides in relevant part that
 [w]hether a disclosure statement contains adequate information is not governed by any otherwise applicable nonbankruptcy law, rule, or regulation....
 11 U.S.C. Sec. 1125(d) (1982).
 
 
 [7]
 Moreover, PSNH has the exclusive right to solicit such support for 120 days after an order for relief under Chapter 11 is issued by the bankruptcy court. See 11 U.S.C. Sec. 1121(b) (1982)