■OPINION OF THE COURT
 

 JAMES HUNTER, III, Circuit Judge:
 

 Century Glove, Inc. (“Century Glove”), a debtor seeking reorganization under the federal bankruptcy laws, seeks review of a district court order dismissing sanctions imposed on its creditors. Century Glove claims that one of its creditors, First American Bank (“FAB”), unlawfully solicited the votes of other creditors, in violation of 11 U.S.C. § 1125. The bankruptcy court agreed, imposing sanctions against FAB and invalidating another creditor’s rejection of Century Glove’s plan. On appeal, the district court reversed, holding FAB’s action lawful. Century Glove now appeals to this court. We will affirm the order of the district court.
 

 I.
 

 Century Glove filed its petition seeking reorganization in bankruptcy on November 14, 1985. On August 1, 1986, Century Glove filed its reorganization plan, along with a draft of the disclosure statement to be presented along with the plan. Arguing that Century Glove’s largest claimed assets are speculative lawsuits (including one against FAB), FAB presented a copy of an alternative plan to the unsecured creditors’ committee. FAB advised that it would seek court approval to present its plan as soon as possible. The committee ultimately rejected the plan in favor of that of the debtor. On December 2, 1986, the bankruptcy court approved Century Glove’s disclosure statement. A copy of the plan, the statement, and a sample ballot were then sent to Century Glove’s creditors entitled to vote on the plan’s acceptance.
 

 Between December 12 and December 17, 1986, an attorney for FAB, John M. Blox-om, telephoned attorneys representing several of Century Glove’s creditors. Among these creditors were Latham Four Partnerships (“Latham Four”) and Bankers Trust New York Corporation (“BTNY”).
 
 [1]
 
 Blox-om sought to find out what these creditors thought of the proposed reorganization, and to convince them to vote against the plan. He said that, while there was no other plan approved for presentation, and thus no other plan “on the table,” FAB had drafted a plan and had tried to file it. The creditors’ attorneys then asked for a copy of the plan, which FAB provided. The copies were marked “draft” arid covering letters stated that they were submitted to the creditors for their comments. The draft did not contain certain information necessary for a proper disclosure statement, such as who would manage Century Glove after reorganization.
 

 
 *96
 
 With a copy of its draft plan, FAB also sent to Latham Four a copy of a letter written to the unsecured creditors’ committee by its counsel. In the letter, dated August 26, 1986, counsel questioned the committee’s endorsement of the Century Glove plan, arguing that the lawsuits which Century Glove claims as assets are too speculative. As stated, the committee endorsed the plan anyway. Upset with this decision, one of its members sent a copy of the letter to a former officer of Century Glove. The officer then sent a copy, unsolicited, to FAB. Uncertain whether the letter was protected by an attorney-client privilege, FAB asked the committee member whether he had disclosed the letter voluntarily. He said that he had, and furnished a second copy directly to FAB. FAB attached this letter to a motion before the bankruptcy court seeking to have the committee replaced. The bankruptcy court later held the letter a privileged communication.
 

 BTNY had made a preliminary decision on September 12, 1986, to reject Century Glove’s plan. It reaffirmed this decision on December 15, when it received a copy of the plan and disclosure. Counsel for BTNY spoke with Bloxom the next day, December 16, 1986, and Bloxom mailed a letter confirming the call, but by mistake Bloxom did not send a draft of the alternate plan until December 17. On that day, counsel for BTNY prepared its ballot rejecting Century Glove’s plan, and informed Bloxom of its vote.
 

 After receiving the several rejections, Century Glove petitioned the bankruptcy court to designate, or invalidate, the votes of FAB, Latham Four and BTNY. Century Glove argued that FAB had acted in bad faith in procuring these rejections.
 

 II.
 

 The bankruptcy court held that FAB had violated 11 U.S.C. § 1125(b), which allows solicitation of acceptance or rejections only after an approved disclosure statement has been provided the creditor. Though a statement had been filed and provided, the bankruptcy court stated that:
 

 solicitations ... must be limited by the contents of the plan, the disclosure statement, and any other court-approved solicitation material. The solicitee may not be given information outside of these approved documents.
 

 The bankruptcy court found that FAB violated the section by providing additional materials such as copies of its draft plan. 74 B.R. 952.
 

 The bankruptcy court also concluded that FAB had violated “the spirit of § 1121(b), since FAB was apparently seeking approval of a plan which was not yet filed and which it could not file_”
 
 [2]
 
 This “impropriety” was “heightened” by the absence from the FAB plan of such information as “who will manage the debtor.” The bankruptcy court also found “improper” the disclosure by FAB of the August 26, 1986 letter to the creditors’ committee. The court found that FAB’s “machinations” in procuring a second copy of the letter showed that it was “obviously wary” that the letter might be privileged.
 

 The bankruptcy court held invalid La-tham Four’s vote. It allowed the vote of BTNY, however, finding that the creditor had proved it had not relied on FAB’s statements in deciding to reject Century Glove’s plan. The court declined to bar FAB from participating further in the reorganization, finding such a sanction “too harsh,” but instead, ordered FAB to pay for “all costs incurred by [Century Glove] in prosecuting” its motions. The amount of these damages was not specified. Both parties appealed the decision to the district court.
 

 In a decision dated January 5, 1988, the district court affirmed the bankruptcy court rulings allowing BTNY’s vote, but reversed the designation of Latham Four and the imposition of money sanctions against FAB. 81 B.R. 274. The district court disagreed that § 1125(b) requires approval for all materials accompanying a solicitation, and found such a reading in
 
 *97
 
 conflict with the bankruptcy code’s policy of fostering free negotiation among creditors. The district court held that merely supplying additional information does not constitute “bad faith” or a violation of the bankruptcy rules. Therefore, the court concluded, the bankruptcy court had erred in finding that FAB had improperly solicited rejections of the Century Glove plan.
 

 The district court next considered whether FAB had improperly sought acceptance of its own plan. The court found that, in order to facilitate negotiations, communications between creditors should not easily be read as solicitations. Because Bloxom did not make a “specific request for an official vote,”
 
 In re Synder,
 
 51 B.R. 432, 437 (Bankr.D.Utah 1985), FAB’s action “may only be fairly characterized as part of FAB’s negotiations.” Because FAB did not unlawfully solicit rejections, and did not solicit acceptances, the designation and sanction orders of the bankruptcy court were reversed. Century Glove appeals to this court.
 

 III.
 

 Though a district court may review both final and interlocutory orders of the bankruptcy court, 28 U.S.C. § 157(a) & (b), this court has jurisdiction to review only the final orders of the district courts, 28 U.S.C. § 158(d). FAB argues that, until the votes are counted, a designation order cannot be final. We find that this court has jurisdiction to review the bankruptcy court’s order imposing costs, but agree with FAB that we lack jurisdiction to review at this time the decisions regarding the designation of certain votes.
 

 A.
 

 The bankruptcy court held that FAB had “clearly violated” 11 U.S.C. § 1125(b), which bars the solicitation of acceptances or rejections until a creditor has received “adequate information” approved by the court. Ultimately, the bankruptcy court ordered FAB to pay the debtor’s costs as a sanction for that violation. The bankruptcy court also considered whether certain votes should be designated under 11 U.S.C. § 1126(e). That section allows the bankruptcy court to hold invalid any vote that was not made or solicited “in good faith or in accordance with the provisions of this title.” Although the bankruptcy court relied on its finding of liability under § 1125(b) in deciding whether to designate votes, we find the costs and designation decisions separate.
 

 Section 1125(b) bars certain solicitation activities, regardless of the intent of the actor. Whether that provision is violated is not a matter left to the discretion of the bankruptcy court, but is a matter of fact and law. Section 1126(e), on the other hand, is not simply a remedy for § 1125(b) violations. It grants the bankruptcy court discretion to sanction any conduct that taints the voting process, whether it violates a specific provision or is in “bad faith.” Thus, the bankruptcy court also considered several “improprieties” unrelated to the § 1125(b) decision in deciding whether the designate votes. Further, § 1126(e) grants a limited discretion: the bankruptcy court may designate a vote or not. The section does not give the court discretion to impose other remedies, such as the payment of costs. Thus, determining whether the bankruptcy court acted properly in imposing costs does not determine whether it acted properly in designating (or not) certain votes. We therefore find the bankruptcy court’s order imposing costs and designating one vote separate decisions. We review each for finality.
 

 B.
 

 This court takes a pragmatic view of the finality of bankruptcy appeals.
 
 See In re Brown,
 
 803 F.2d 120, 122 (3d Cir.1986). In determining finality, this court balances several factors, including
 

 the impact on the assets of the bankruptcy estate, the necessity for further fact-finding on remand, the preclusive effect of our decision on the merits on further litigation, and whether the interest of judicial economy would be furthered.
 

 In re Meyertech,
 
 831 F.2d 410, 414 (3d Cir.1987). Applying these considerations
 
 *98
 
 to the facts of this case, we find the district court’s order on § 1125(b) liability final and reviewable.
 

 The impact on the estate is the “[f]irst and most important” factor in considering finality.
 
 Meyertech,
 
 831 F.2d at 414. The factor recognizes that issues central to the progress of the bankruptcy petition, those “likely to affect the distribution of the debtor’s assets, or the relationship among the creditors,” should be resolved quickly.
 
 Brown,
 
 803 F.2d at 122. Delayed review in such central cases threatens to undo the entire petition, possibly “wasting several years of bankruptcy proceedings.”
 
 Id.
 
 On the other hand, where the order does not affect these central interests, so that the pragmatic concerns have less force, this court has applied “the traditional finality requirements_”
 
 Id.
 
 at 123.
 

 The sanctions imposed by the bankruptcy court on FAB have no effect on the assets of the debtor, Century Glove. However, the order does affect greatly the relationship between creditors. Appellant questions the limits on the permissible communications between creditors in a reorganization. Attempts to influence a vote cannot be separated from the negotiations, between creditors and between the creditors and the debtor, over the terms of the plan: it is the threat of rejection or the possibility of acceptance that spurs these negotiations. Though the order appealed from does not have clear impact on the debtor’s assets, the conduct at issue in this case lies at the center of the relationship between creditors in a reorganization.
 

 Postponing consideration of this issue may result in the waste of time and bankruptcy proceedings this court has previously sought to avoid.
 
 See e.g., In re Amatex Corp., 755
 
 F.2d 1034, 1040 (3d Cir.1985) (review of intervention order). The debtor argues that the district court has allowed too-free communications regarding the plan. Because the vote has not yet been taken, the creditors may continue to communicate with each other over the plan, and the district court’s order is likely to affect the character of the ongoing communications. Were this court later to reverse the district court, viewing more narrowly the permissible communications between creditors, all these later communications will be subject to challenge. Because the communications lie at the center of the reorganization, the challenge could easily spoil the entire negotiation and voting process. Therefore, the potential practical impact of the district court’s decision on the course of the reorganization counsels immediate review.
 

 Of course, pragmatic considerations cannot render a nonfinal order final, or expand the jurisdiction of this court.
 
 Meyertech,
 
 831 F.2d at 414. Applying the other factors laid out in
 
 Meyertech,
 
 we are persuaded that the order is final. Century Glove, claiming that FAB had violated the terms of the bankruptcy laws, petitioned the bankruptcy court for sanctions. That court agreed and specified sanctions. The district court reversed and entered its own order finding no liability. This order leaves nothing more for either the bankruptcy court or the district court to decide. No more factfinding is needed. No later decision by either court will affect the order. If we affirm the district court’s order, preventing liability, our decision will end the litigation over this issue.
 
 See F/S Airlease II, Inc. v. Simon,
 
 844 F.2d 99, 104-05 (3d Cir.1988). Regarding the imposition of costs, “nothing remain[s] for the district court to do.”
 
 Universal Minerals, Inc. v. C.A. Hughes & Co.,
 
 669 F.2d 98, 101 (3d Cir.1981).
 

 Of course, if we reverse the district court, there will then have to be a hearing on damages. We do not find the decision imposing costs is rendered interlocutory because the bankruptcy court had not reduced the damages award to a specific figure before its decision was appealed to the district court. Where the order appealed from finds liability and imposes a monetary remedy, but does not reduce that award to a specific figure, this court will usually find the order interlocutory.
 
 See e.g., In re Jeannette,
 
 832 F.2d 43 (3d Cir.1987) (Rule 11 sanctions);
 
 Brown,
 
 803 F.2d at 123 (improper communications);
 
 but see, Universal Minerals,
 
 669 F.2d at 101 (remand for an accounting final). Here, how
 
 *99
 
 ever, the order on appeal finds no liability. To wait for an order quantifying damages is to wait permanently. With no liability, the bankruptcy court has no reason to determine how much Century Glove expended in prosecuting its motion, and no culpable conduct from which to measure damages.
 
 [3]
 
 Finding no liability, the district court finally determined the § 1125(b) issue. A final decision on a creditor’s liability to the debt- or for its post-petition conduct is precisely the kind of question which this court reviews during the conduct of the bankruptcy petition.
 
 See e.g., Brown v. Pennsylvania State Employees Credit Union,
 
 851 F.2d 81 (3d Cir.1988).
 

 C.
 

 FAB argues that the district court’s decision to allow the votes is not final. To be effective, a reorganization plan usually must be approved by the vote of each class of creditors, 11 U.S.C. § 1129(A)(8), and always by at least one class of creditors,
 
 id.
 
 at § 1129(a)(10). The bankruptcy court has yet to divide the creditors into classes or tally their votes. Because the voting has not yet been conducted, Century Glove’s plan might be defeated or upheld whether or not the contested rejections are counted.
 
 [4]
 
 Therefore, FAB argues, the district court’s order is not yet final. We agree.
 

 Because this court has jurisdiction to review the imposition of costs under § 1125(b), and thus the propriety of FAB’s conduct, reaching the decision to designate votes will not affect substantially the relationship among creditors. Even if the effect were substantial, the pragmatic concerns of bankruptcy jurisdiction require that we do not review the decision before the vote has been tallied. If the outcome of the vote is the same whether or not the contested votes are counted, any decision by this court on that issue will have no practical effect. We are loathe to render an opinion which may prove advisory, especially where no practical considerations weigh in favor of immediate review. Delayed considerations does not threaten to waste years of proceedings: reversing the designation (or, as here, the allowance) of certain votes requires only that the vote be taken again. That determination does not affect the many other decisions a bankruptcy court must render in finally determining whether to confirm a plan.
 
 [5]
 

 23. We therefore hold that the district court’s decision reversing the designation of Latham Four’s vote and permitting the votes of the other creditors is not subject to review at this time. However, the decision holding that FAB did not violate 11 U.S.C. § 1125(b) and reversing the imposition of costs does present a separate and final order. We will review the merits of that decision.
 
 [6]
 

 
 *100
 
 IV.
 

 Century Glove argues that the district court erred in holding FAB did not improperly solicit rejections of Century Glove’s reorganization plan. Since a district court sits in an appellate capacity over bankruptcy decisions, our review of the district court’s decision is plenary.
 
 Universal Minerals, Inc. v. C.A. Hughes & Co.,
 
 669 F.2d 98, 101-02 (3d Cir.1981). We should apply the same standard of the review the district court should have applied. The bankruptcy court based its finding that FAB had violated 11 U.S.C. § 1125(b) primarily on its determination that a solicitee may not be provided with materials not approved by the court. The district court disagreed with this reading of the law. As a question of the proper interpretation of the bankruptcy code, we have plenary review. However, we can reverse the factual findings of the bankruptcy court only if, applying the proper law, they are clearly erroneous. Bankruptcy Rule 8013.
 

 Section 1125(b) states, in pertinent part, that:
 

 An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information.
 

 There is no question that, at the time of FAB’s solicitations, the solicitees had received a summary of the plan and a court-approved statement disclosing adequate information. Also, the bankruptcy court’s factual conclusion that FAB was seeking rejections of Century Glove’s plan is not clearly erroneous, and so must be assumed. Century Glove argues that FAB also was required to get court approval before it could disclose additional materials in seeking rejections.
 

 Century Glove’s interpretation of the section cannot stand. Century Glove argues, and the bankruptcy court assumed, that only approved statements may be communicated to creditors. The statute, however, never limits the facts which a creditor may receive, but only the
 
 time
 
 when a creditor may be solicited. Congress was concerned not that creditors’ votes were based on misinformation, but that they were based on no information at all.
 
 See
 
 H.R. 95-595, at pp. 225-25, 95th Cong., 2d Sess., 124 Cong. Rec. _,
 
 reprinted in,
 
 1978 U.S.C.C.A.A.N. 5963, 6185 (House Report). Rather than limiting the information available to a creditor, § 1125 seeks to guarantee a minimum amount of information to the creditor asked for its vote.
 
 See
 
 S.R. 95-989, at pp. 121, 95th Cong., 2d Sess., 124 Cong.Rec. _,
 
 reprinted in,
 
 1978 U.S.C.C.A.A.N. 5787, 5907 (“A plan is necessarily predicated on knowledge of the assets and liabilities being dealt with and on factually supported expectations as to the future course of the business....”) (Senate Report). The provision sets a floor, not a ceiling. Thus, we find that § 1125 does not on its face empower the bankruptcy court to require that all communications between creditors be approved by the court.
 

 As the district court pointed out, allowing a bankruptcy court to regulate communications between creditors conflicts with the language of the statute. A creditor may receive information from sources other than the disclosure statement. Section 1125 itself defines “typical investor” of a particular class in part, as one having “such ability to obtain such information from sources other than the disclosure required by this section ” 11 U.S.C. § 1125(a)(2)(C). In enacting the bankruptcy code, Congress contemplated that the creditors would be in active negotiations with the debtor over the plan.
 
 See infra,
 
 part V. The necessity of “adequate information” was intended to help creditors in their negotiations.
 
 See In re Gulph Woods,
 
 83 B.R. 339 (Bankr.E.D.Pa.1988). Allowing the bankruptcy court to regulate communications between creditors under the guise of “adequate information” under
 
 *101
 
 cuts the very purpose of the statutory requirement.
 

 Lastly, Century Glove’s reading of § 1125 creates procedural difficulties. Century Glove provides this court no means to distinguish predictably between mere interpretations of the approved information, and additional information requiring separate approvals. Therefore, to be safe, the creditor must seek prior court approval for every communication with another creditor (or refrain from communication), whether soliciting a rejection or an acceptance. Congress can hardly have intended such a result. It would multiply hearings, hence expense and delay, at a time when efficiency is greatly needed.
 
 [7]
 
 We also note that, as expressed in the House Report, Congress evidently contemplated a single hearing on the adequacy of the disclosure statement.
 
 See
 
 House Report, 1978 U.S.C.C.A.A.N. at 6186.
 
 [8]
 

 Century Glove argues that two additional instances show that FAB violated § 1125(b). First, it claims that FAB’s draft plan contained material misrepresentations, mostly omissions. Second, it claims that FAB improperly disclosed to Latham Four a letter the bankruptcy court later found privileged. The bankruptcy court found both “improper” in support of its finding under § 1125(b), and Century Glove argues that the bankruptcy court’s decision can be affirmed on these grounds. The problem with the argument is that it rests on an erroneous interpretation of the law. Once adequate information has been provided a creditor, § 1125(b) does not limit communication between creditors. It is not an anti-fraud device. Thus, the bankruptcy court erred in holding that FAB had violated § 1125(b) by communicating with other materials. The district court therefore properly reversed the bankruptcy court on this issue.
 

 V.
 

 Though FAB was not limited in its solicitation of rejections, § 1125 did prevent FAB from soliciting acceptances of its own plan. The bankruptcy court held that, “since FAB was apparently seeking approval of a plan which was not yet filed,” FAB violated § 1125. The court also found that FAB's actions violated the spirit of § 1121, which provides the debtor with a limited, exclusive right to present a plan. Reversing, the district court held that solicitations barred by § 1125(b) include only the “specific request for an official vote,” and not discussions of and negotiations over a plan leading up to its presentation.
 
 In re Snyder,
 
 51 B.R. 432, 437 (Bankr.D.Utah 1985). Because Bloxom explained that he was sending the draft only for discussion purposes, the district court found that the transmittal “may only be fairly characterized as part of FAB’s negotiations.” We exercise plenary review over the proper interpretation of the legal term “solicitation.”
 

 We agree with the district court that “solicitation” must be read narrowly. A broad reading of § 1125 can seriously inhibit free creditor negotiations. All parties agree that FAB is not barred from honestly negotiating with other creditors about its unfiled plan. “Solicitations with respect to a plan do not involve mere requests for opinions.” Senate Report, 1978 U.S.C.C.A. A.N. at 5907. The purpose of negotiations between creditors is to reach a compromise over the terms of a tentative plan. The purpose of compromise is to win acceptance for the plan. We find no principled, predictable difference between negotiation and solicitation of future acceptances. We
 
 *102
 
 therefore reject any definition of solicitation which might cause creditors to limit their negotiations.
 
 [9]
 

 A narrow definition of “solicitation” does not offend the language or policy of 11 U.S.C. § 1121(b). The section provides only that the debtor temporarily has the exclusive right to
 
 file
 
 a plan (and thus have it voted on). It does not state that the debtor has a right to have its plan
 
 considered
 
 exclusively.
 
 [10]
 
 A right of exclusive consideration is not warranted in the policy of the section. Congress believed that debtors often delay confirmation of a plan, while creditors want quick confirmation. Therefore,
 
 unlimited
 
 exclusivity gave a debtor “undue bargaining leverage,” because it could use the threat of delay to force unfair concessions. House Report, 1978 U.S.C.C.A.A.N. at 6191. On the other hand, Congress evidently felt that creditors might not seek the plan fairest to the debt- or. Therefore, Congress allowed a
 
 limited
 
 period of exclusivity, giving the debtor “adequate time to negotiate a settlement, without unduly delaying creditors.”
 
 Id.
 
 Section 1121 allows a debtor the threat of limited delay to offset the creditors’ voting power of approval. FAB did nothing to reduce Century’s threat of limited delay, and so did not offend the balance of bargaining powers created by § 1121 or the “spirit” of the law.
 

 On the contrary, Century Glove’s reading of § 1121(b) would in fact give the debtor powers not contemplated by Congress. The ability of a creditor to compare the debtor’s proposals against other possibilities is a powerful tool by which to judge the reasonableness of the proposals. A broad exclusivity provision, holding that only the debtor’s plan may be “on the table,” takes this tool from creditors. Other creditors will not have comparisons with which to judge the proposals of the debt- or’s plan, to the benefit of the debtor proposing a reorganization plan. The history of § 1121 gives no indication that Congress intended to benefit the debtor in this way. The legislative history counsels a narrow reading of the section, one which FAB’s actions do not violate.
 

 We recognize that § 1125(b) bars the untimely solicitation of an “acceptance or rejection,” indicating that the same definition applies to both. A narrow definition might allow a debtor to send materials seeking to prepare support for the plan, “for the consideration of the creditors,” without adequate information approved by the court. Though such preparatory materials may undermine the purpose of adequate disclosure, the potential harm is limited in several ways. First, a creditor still must receive adequate information before casting a final vote, giving the creditor a chance to reconsider its preliminary decision. The harm is further limited by free and open negotiations between creditors. Last, because they are not “solicitations,” pre-disclosure communications may still be subject to the stricter limitations of the securities laws. 11 U.S.C. § 1125(e). Where, as here, the creditors are counselled and already have received disclosure about the debtor’s business, there seems little need for additional procedural formalities.
 
 See e.g., In re Northwest Recreational Activities, Inc.,
 
 4 B.R. 43 (Bankr.N.D.Ga.1980) (negotiations between debtor and creditor precede § 1125(b) approvals).
 

 Therefore, we hold that a party does not solicit acceptances when it presents a draft plan for the consideration of another creditor, but does not request that creditor’s vote. Applying this definition, FAB did not solicit acceptances of its plan. Century Glove does not dispute that FAB never asked for a vote, and clearly stated that the plan was not yet available for approval. Bloxom communicated with lawyers for the creditors, and there is no suggestion by Century that these lawyers
 
 *103
 
 did not understand the limitations. Also as Century argues, FAB never sent its plan to Hartford Insurance because Hartford firmly opposed Century’s plan. Contrary to Century’s conclusion, though, this fact argues that FAB sent copies of its plan because it was interested in obtaining rejections, not acceptances. (An opponent of Century’s plan would be an ideal person to solicit for acceptances.) These undisputed facts require a finding that FAB did not “solicit” acceptances within the meaning of § 1125(b).
 

 VI.
 

 We hold that the district court correctly determined that Century Glove failed to show that FAB violated 11 U.S.C. § 1125 by soliciting acceptances or improperly soliciting rejections. We therefore will affirm the district court’s order reversing the imposition of costs against FAB. We do not decide, however, whether the circumstances merit designation of the votes of any creditors.
 

 [1]
 

 . A third creditor, Southwest Gloves Acquisition Group, was also involved. The parties have informed this court that a later decision of a lower court has mooted any dispute concerning is vote.
 

 [2]
 

 . The parties do not dispute that 11 U.S.C. § 1121(b), which provides the debtor the exclusive right to file a plan for a limited period of time, applied at all times relevant to this action.
 

 [3]
 

 . Because the district court reversed the bankruptcy court and entered judgment itself, rather than ordering a remand, the bankruptcy court may be without power to conduct further proceedings on this issue. Even if the bankruptcy court were to enter an order quantifying damages, the district court would be without power to review it, because in this context the order would be wholly advisory.
 

 [4]
 

 . When the district court asked for the results of the voting, FAB stated that Latham Four’s vote would likely decide whether or not the plan was accepted, while counsel for Century Glove stated that acceptance did not rest on the vote of that one creditor. The district court relied on this fact in determining that the designation order was appealable as an interlocutory but not a final order. Now FAB and Century have changed positions on the importance of the four votes.
 

 [5]
 

 . Most important here, the bankruptcy court must divide the creditors into classes in order to take the vote of each class. 11 U.S.C. § 1129(a)(7) & (8). We also note that, in an appropriate case, the bankruptcy court may set aside the results of a vote, regardless of its outcome. 11 U.S.C. § 1129(b)(1).
 

 [6]
 

 . We recognize that the district court did not appear to separate the two decisions, reversing the designation of the vote because FAB had not violated § 1125(b). The district court did not consider the other grounds for designation mentioned by the bankruptcy court, such as FAB’s use of a privileged communication and the absence of certain information from FAB’s draft plan. We do not consider or decide whether these findings have merit, or, assuming such merit, whether they provide the bankruptcy court the discretion to designate votes. Also, because it was not contested below, we do not determine whether the bankruptcy court has the
 
 *100
 
 power to award costs for violations of § 1125(b).
 

 [7]
 

 . Expense was a prime reason Congress suspended the applicability of the securities laws to reorganizations.
 
 See,
 
 House Report 1978 U.S.C. C.A.A.N. at 6186. The costs of delay was a prime reason the debtor was given a limited "exclusivity period" to present its reorganization plan.
 
 See infra,
 
 Part V.
 

 [8]
 

 . Century Glove relies for its interpretation of § 1125 entirely on statements in a bankruptcy treatise. See, 5
 
 Collier on Bankruptcy
 
 § 1125.03, at 1125-39 ff. (15th ed. 1987). The author found the provision ambiguous, and states only that a creditor "should” seek approval. As argued above, strong policy and administrative reasons — not to mention the likely intent of Congress — argue that this court should not impose any additional requirements on communications between creditors.
 

 [9]
 

 . Barring negotiations also would provide an unwarranted boon for the debtor: creditors wholly unable to be sure that an alternative plan can be agreed are more likely to vote for the debtor’s proposal rather than risk unknown delay.
 

 [10]
 

 . The bankruptcy court, perhaps recognizing this, found only that FAB violated the section’s "spirit”.