**In re CRAMER, INC., Debtor.**

**Bankruptcy No. 88–40275–11.**

United States Bankruptcy Court,
D. Kansas.

March 20, 1989.

Norman E. Beal, Hillix, Brewer, Hoffhaus Whittaker & Horner, Kansas City, Mo., for Fred Braun.

Calvin J. Karlin, Barber, Emerson, Springer, Zinn & Murray, Lawrence, Kan., for Bobbie Jo Criss.

Donald Loudon, Joel Pelofsky, Shugart, Thomson & Kilroy, P.C., Kansas City, Mo., for debtor.

Daniel D. Phillips, Husch, Eppenberger, Cornfeld, Donohue & Jenkins, Kansas City, Mo., for Unsecured Creditors' Committee.

Carl J. Spector, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for Centerre Bank.

John V. Dooner, Stinson, Mag & Fizzell, Overland Park, Kan., for Commerce Bank.

Joyce Owen, Asst. U.S. Trustee, Wichita, Kan., for U.S. Trustee.

Thomas Mullinix, Evans & Mullinix, Kansas City, Kan., for Equity Security Holders Committee.

## MEMORANDUM OF DECISION

JAMES A. PUSATERI, Bankruptcy Judge.

This matter is before the Court on Fred P. Braun, Jr.'s motion for an order prohibiting solicitation of acceptance of debtor's plan and on the response of the debtor, Bobbie Jo Criss, the Unsecured Creditors Committee and Centerre and Commerce Banks thereto. Fred P. Braun, Jr., appears by Norman E. Beal, of Hillix, Brewer, Hoffhaus, Whittaker & Horner. Bobbie Jo Criss appears by Calvin J. Karlin, of Barber, Emerson, Springer, Zinn & Murray. Debtor appears by Donald Loudon and Joel Pelofsky, of Shugart, Thomson & Kilroy, P.C. The Committee appears by Daniel D. Phillips, of Husch, Eppenberger, Cornfeld, Donohue & Jenkins. Centerre Bank appears by Carl J. Spector, of Bryan, Cave, McPheeters & McRoberts. Commerce Bank appears by John V. Donner, of Stinson, Mag & Fizzell. Other appearances were the U.S. Trustee, by Joyce Owen and the Equity Security Holders Committee by Thomas Mullinix of Evans & Mullinix.

The Court entertained oral arguments on the motion on March 2, 1989, and thereafter directed the parties to submit briefs. Having reviewed the relevant material, including the plan and disclosure statement of Braun, and having permitted additional oral argument, the Court announced a summary of its ruling at the confirmation hearing held March 6, 1989. This memorandum incorporates and further memorializes the announced ruling.

## BACKGROUND

Debtor is a corporation that manufactures office furniture and equipment. It filed a voluntary petition for chapter 11 relief on February 29, 1988. Fred P. Braun, Jr. is a competing plan proponent and a shareholder of debtor and member of the Equity Security Holders Committee.

On January 13, 1989, this Court held a hearing on the amended disclosure statements of debtor and Braun. The Court ordered both parties to make certain amendments. Debtor filed its first amended disclosure statement on January 23, 1989, and Braun filed his on January 30, 1989. The Court thereafter approved both amended disclosure statements in an order fixing the time for balloting by March 6, 1989 and the time for hearing on confirmation on March 15, 1989. In a companion order, the Court ordered the parties to notice the plans and disclosure statements by February 9, 1989.

In the interim, between the debtor's filing of the amended disclosure statement on January 23, 1989 and the deadline for noticing of February 9, 1989, debtor continued to negotiate with the Unsecured Creditors Committee. The negotiations culminated in debtor's mailing of a plan and disclosure statement that debtor had denominated "Second Amended Plan and Disclosure Statement" dated February 9, 1989.[1] The Second Amended Plan and Disclosure Statement incorporated changes from the previous disclosure statement and plan which had not been presented or approved by the Court. Specifically, the following changes in the disclosure statement, with corresponding changes in the plan, were made: (1) the definition of "Excess Cash Flow," a percentage of which is to be used to redeem preferred stock issued to unsecured creditors, was changed from

the sum equal to Average Monthly Cash Less Minimum Retained Cash, calculated on January 15th and July 15th of each year, *provided, however,* that capital infusions, whether equity or debt other than the Tower Loan, shall not be used in calculating excess cash flow

to

the amount equal to net cash less Minimum Retained Cash, calculated on the applicable reporting date of each year, *provided, however,* that capital infusions of equity or funds obtained to refinance the Tower Loan up to $3,250,000 shall not be used in calculating Excess Cash Flow;

(2) the definition of "Average Monthly Cash" was changed from

the sum equal to the average aggregate balance of Cramer's Bank Accounts over each six month or lesser period, commencing on the Effective Date, calculated on January 15th and July 15th of each year, using the balances set forth on the bank statements of the Bank Accounts, provided, however, that capital infusions, whether equity or subordinated debt,

shall not be used in calculating Average Monthly Cash

to

the sum equal to the average monthly balance of Cramer's Bank Accounts for the six calendar months commencing on the Effective Date, immediately preceding the applicable reporting date, reflecting the balances set forth on the bank statements of the Bank Accounts as the average daily balance provided, however, that capital infusions of equity or sums obtained to replace an existing secured lender up to $3,250,000 shall not be used in calculating Average Monthly Cash;

(3) the definition of "Minimum Retained Cash" was changed from

that sum below which Cramer's Bank Accounts shall not be diminished due to payments on account of Preferred Stock, namely, for the year following the Effective Date—$750,000, and thereafter—$600,000; *provided, however,* that capital infusions, whether equity or subordinated debt, shall not be used in calculating Minimum Retained Cash;

to

for the year 1989, $750,000, for all subsequent years $600,000; *provided, however,* that capital infusions of equity or funds obtained to refinance the Tower Bank loan up to $3,250,000, shall not be used in calculating Minimum Retained Cash;

(4) the treatment of the insurance claimants was changed from allowing treatment of any deductible as an allowed unsecured claim to allowing as a general unsecured claim only 10% of the amount of the deductible and increasing the amount of preferred stock by the 10% amount of such allowed deductible, up to 2,200,000 shares and $2,200,000; and

(5) the treatment of the unsecured class of claims was changed from providing that preferred stock be redeemed at rates of 0% the first year, 20% of excess cash flow the second through sixth years, and 100% thereafter; to in the first two years of the

1. The Court notes that the Second Amended Disclosure Statement was never filed in the Court records as such.

plan "the greater of $80,000 or 60% of Excess Cash Flow and thereafter 60% of Excess Cash Flow".

The Second Amended Disclosure Statement and Plan also failed to include historical financial data that had been included in the First Amended Plan and contained some semantic changes (e.g., the terms "disbursing agent" and "sinking fund" were replaced by "trustee" and "funds" wherever appropriate).

On February 17, 1989, Braun moved for an order prohibiting solicitation and acceptance of debtor's plan and rescheduling voting on Braun's plan alone, on the grounds that the debtor's mailing did not comply with Section 1125. The debtor, the Committee, and Banks responded that the confirmation hearing should go forward on the plan mailed to creditors, as no prejudice resulted to creditors. The evidence is that at least one of the insurance class claimants, Bobbie Jo Criss, has voted to accept debtor's plan although the effect of the changes on that class is unknown, and may be either detrimental or beneficial. The ballot report presented at the confirmation hearing establishes that the creditors voted in substantial numbers in favor of debtor's plan and that the Braun plan failed to gain an accepting impaired class.

## CONCLUSIONS OF LAW

■ The debtor, the Banks, and the Committee specifically argue that (1) the plan as mailed out reflects the disclosure statement as mailed out and so is not misleading to creditors; (2) none of the changes are material or prejudice creditors in any way; (3) to strike debtor's plan would only penalize the creditors who have overwhelmingly voted in favor of the plan and cause further delay and expense; and (4) Braun, who is neither an unsecured creditor nor an insurance claimant but is only an equity securities holder, has no standing to contest changes made in treatment of those two classes. Braun responds that the prejudice is to his ability to compete against a plan different from the plan approved by the Court through the disclosure statement approval process and to the Court approval process itself.

Section 1125(b) provides:

An acceptance or rejection of a plan may not be solicited after the commencement of the case under this title from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the Court as containing adequate information.

Neither the Court nor the parties found any cases on point. However, the Court agrees with Braun that lack of prejudice to creditors is not the dispositive consideration.

The central theme of plan confirmation under Chapter 11, and the theme that distinguishes it from Chapter 12 and previous Chapter XI, is Court approval of the disclosure statement. See *House Report* No. 95–595, 95th Cong., 1st Sess. 408–10 (1977), U.S.Code Cong. & Admin.News 1978, p. 5787. Sections 1121 et seq., particularly Section 1125 and the corresponding Bankruptcy Rules, require the Court's approval of disclosure statement before the plan and disclosure statement are distributed to creditors for voting. In a typical case in which only one plan and disclosure statement is filed, the Court stands in the shoes of all creditors in determining whether a disclosure statement contains "adequate information." In a case in which competing plans are filed, Court approval of the disclosure statements additionally insures that all plan proponents may compete for the creditors' approval of their respective plans from a defined and fair starting point.

The Court would agree that immaterial changes in the plan and disclosure statement, such as some of the mere changes in semantics that occurred in this case, do not unduly interfere with the process of Court approval, although the better practice would be to have all such changes approved. Further, debtor's inadvertent omission of the financial statements does not concern the Court, as the omission was

subsequently corrected in an additional mailing. In this case, however, the Court cannot agree that all the changes are immaterial. Certainly the change in treatment of the unsecured and insurance claimants classes is significant, as is the change in the definition of "excess cash flow" from which funds are to be derived in order to redeem preferred stock. Even the parties have conceded that the change as to the insurance claimants may be beneficial or detrimental and simply cannot be calculated at this point.

Second, the Court believes the parties' standing argument is misplaced. The fact that one insurance claimant out of some forty-four supports the change is hardly sufficient for the Court to say that all insurance claimants "accept" the change; and second, as a plan proponent Braun is a "party aggrieved" within the definition of someone who has standing as he has played by the rules and has an interest in seeing that his competitor play by the rules. Most important, the parties overlook that the harm is to the integrity of the process established by Congress as implemented by the Court.

The Court believes this case should be distinguished from the typical chapter 11 where there is one plan, a limited number of players, and where parties negotiate for plan changes after the disclosure statement has been approved and the plan distributed. In such a case, this Court and no doubt the majority of courts permit the debtor and major creditors to negotiate a change without the necessity of re-balloting, particularly where those parties affected by the change consent to the change and approve deviation from the rules. See Bankruptcy Rule 3019; *In re American Solar King Corp.*, 90 B.R. 808 (Bankr.W.D.Tex.1988). The Court in those cases in essence waives the rules which are, after all, for the benefit of the affected creditors. In this case, however, the other major interested party, the competing plan proponent, did not accede in waiving the rules, the Court did not authorize a waiver of the rules and all creditors affected have not sought waiver of the rules.

Accordingly, the Court finds that debtor's Second Amended Disclosure Statement, because it contains material changes, is not the disclosure statement approved by the Court and must be submitted to the Court for approval before another mailing and balloting can take place. The ballots already submitted are thus invalid because they were submitted in connection with an unapproved solicitation. The Court, however, accepts evidence of the invalid ballots as evidence of the creditors' preference. See *Century Glove, Inc. v. First American Bank of New York*, 860 F.2d 94 (11th Cir.1988). As Braun's plan has failed to gain an accepting impaired class, and Braun has indicated he desires to submit an amended plan and disclosure statement, the Court will order both parties to file their amendments at the same time.

The Court desires to emphasize that it sees no malevolent intent on the part of the debtor in causing an unapproved disclosure statement to have been distributed to creditors. For that reason, the Court believes that striking debtor's plan altogether and considering only Braun's plan may unduly penalize the creditors who have expressed a clear preference for debtor's proposed plan. Rather, any punishment should be inflicted upon those who caused the problem, namely, counsel for debtor. To that end, the Court intends to deny counsel compensation for attendance at the confirmation hearing and hearing on this motion and other attendant matters. Should the debtor renotice its amended disclosure statement and resubmit its plan for balloting the reduction in fees shall be at least enough to offset the additional costs and expenses incurred by the debtor in that endeavor.

The foregoing constitutes Findings of Fact and Conclusions of Law under Bankruptcy Rule 7052 and Rule 52(a) of the Federal Rules of Civil Procedure.