**IN RE KELLOGG SQUARE PARTNERSHIP, Debtor.**

**Bankruptcy No. 3–92–5211.**

United States Bankruptcy Court, D. Minnesota, Third Division.

Oct. 22, 1993.

---

Michael L. Meyer, Ravich, Meyer, Kirkman & McGrath, Minneapolis, MN, for debtor.

Dennis J. Ryan, Stephen M. Mertz, Faegre & Benson, Minneapolis, MN, for Prudential.

Christina Stalker, Mahlum & Associates, St. Paul, MN, for District Energy St. Paul, Inc.

## ORDER DENYING MOTION OF THE PRUDENTIAL INSURANCE COMPANY OF AMERICA FOR DESIGNATION OF BALLOT CAST BY DISTRICT ENERGY ST. PAUL, INC.

GREGORY F. KISHEL, Bankruptcy Judge.

This Chapter 11 case came on before the Court on May 4, 1993, for hearing on the motion of The Prudential Insurance Company of America ("Prudential") for an order designating the filed ballot of District Energy St. Paul, Inc. ("District Energy") pursuant to 11 U.S.C. § 1126(e). Upon the moving and responsive documents and the arguments of counsel, the Court makes the following order.

The Debtor is a Minnesota general partnership. It owns a large parcel of developed commercial real estate at the intersection of Kellogg Boulevard and Robert Street in downtown St. Paul, Minnesota. It filed a voluntary petition for reorganization under Chapter 11 on September 28, 1992. Prudential is its single largest creditor, and is the only secured creditor treated in the "amended" plan of reorganization that the Debtor filed on March 5, 1993.

District Energy is a Minnesota non-profit corporation. It generates hot water for seasonal heating purposes for its customers, which are the owners of large buildings in downtown St. Paul. It provides service to each customer pursuant to a uniform long-term contract, denominated the "Hot Water Delivery Agreement" ("HWDA"). Under District Energy's program of operations, the rates and terms of service that it provides, including rate discounts and other customer incentives, are fixed and uniform among all customers with HWDAs of a particular duration. As of the commencement of this case, District Energy served the Debtor under an HWDA with a 30–year term, which they had entered on December 3, 1982.

As part of the proceedings on confirmation of its plan, the Debtor filed and obtained approval of an amended disclosure statement and served it on all creditors. As to the Debtor's relationship with District Energy, that disclosure statement provides:

On December 3, 1982, [the Debtor] entered into an Agreement with District Energy St. Paul, Inc. ("District Energy") to provide heat to the Building as part of District Energy's hot water heating system in downtown St. Paul for a term of 30 years. Debtor has recently discovered that switching its heating service to natural gas supplied by NSP may result in a considerable savings in heating costs based on the current price of interruptible natural gas service. As a result, Debtor and District Energy have renegotiated the contract and reached agreement as follows: (a) Debtor will reject the December 31, 1982 District Energy Contract; (b) District Energy's unsecured claim in this case will be limited to the unpaid pre-petition charges payable by the Debtor in the approximate sum of $57,214; (c) District Energy will cast a ballot in favor of Debtor's Plan; (d) Debtor and District Energy will enter into a new 10–year contract under District Energy's Incentive Program under which Debtor will receive a 60 percent reduction on its demand rate (approximately a 40% reduction overall) for the first two years of the contract term and (e) if Debtor defaults under the terms of the Plan within 12 months after the Effective Date, Debtor's original December 3, 1982, contract with District Energy will be reinstated and the new District Energy contract will be null and void. The new District Energy contract will result in approximately $269,000 in savings in the first two years and a 10–year reduction in the term of the contract.[1]

The Debtor's plan does not place District Energy's claim into a separate class. In its Article 7, which sets forth the Debtor's proposed treatment of executory contracts and unexpired leases, it provides:

Under an agreement between [the Debtor] and District Energy St. Paul, Inc. ("District Energy") effective upon confirmation of this Plan,

(a) [The Debtor] will reject the December 3, 1982 District Energy Contract as of the Effective Date [of its plan];

(b) District Energy's total unsecured claim in this case, including that for damages caused by rejection of the December 3, 1982 contract, will be limited to the unpaid pre-petition charges payable by the Debtor in the approximate sum of $57,214;

(c) District Energy will cast a ballot in favor of Debtor's Plan;

(d) Debtor and District Energy will enter into a new 10–year contract under District Energy's Incentive Program under which Debtor will receive a 60–percent reduction on its demand rate (approximately a 40% reduction overall) for the first two years of the contract term; and

(e) If Debtor defaults under the terms of the Plan within 12 months after the Effective Date, Debtor's original December 3, 1982 contract with District Energy will be reinstated and the new District Energy Contract will be null and void.

As all three parties to the present motion agree, these provisions accurately set forth an understanding and agreement that the Debtor negotiated with District Energy after the commencement of this case but before the approval and service of its disclosure statement. The agreement was not reduced to an executed writing until after the Court formally approved the disclosure statement. Pursuant to the agreement, District Energy cast a ballot as a member of Class III, the class of unsecured creditors. It accepted the Debtor's plan.

Prudential now moves pursuant to 11 U.S.C. § 1126(e)[2] for an order designating

---

1. The reference to "NSP" is obviously to Northern States Power Company, one of the largest providers of natural gas service in the Twin Cities metropolitan area.

2. This statute provides:

On the request of a party in interest, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not

District Energy's ballot, "on the grounds that the acceptance was not solicited or procured in good faith or in accordance with the provision of the Bankruptcy Code." The effect of such an order would be to disenfranchise District Energy for the proceedings on confirmation of the Debtor's plan. 11 U.S.C. § 1126(c).[3] The Debtor and District Energy both strenuously oppose the motion.

Prudential's theory for this motion incorporates four arguments. In all of them, Prudential accuses the Debtor of conduct in regard to District Energy's participation in this case that was so out of line with the requirements of the Bankruptcy Code that, in Prudential's estimation, District Energy's participation must be denied legal effect.[4] Surprisingly, there is no reported decision that deals with any of these arguments on a comparable fact situation. Under the general principles embodied in various provisions of Chapter 11, however, none of the arguments demonstrates the specific cause for designation that the statute requires. Prudential's motion, then, must be denied.

■ Prudential's first argument is that the Debtor violated 11 U.S.C. § 1125(b).[5] Prudential seems to complain of two separate, but related, acts on the part of the Debtor: its procurement of District Energy's agreement to accept its plan, before the Debtor even presented the final version of its disclosure statement to the Court for approval; and its use of a preliminary draft of its amended disclosure statement and, possibly, other materials, to induce District Energy to

make that agreement. The substantive principles governing the permissibility of these acts are somewhat different.

■ The analysis on Prudential's first point of contention—the alleged prematurity of the Debtor's inducement of District Energy—has to start with the recognition of one threshold precept: the law should favor settlements. This should be no less true in the context of a Chapter 11 case than in any other matter under the jurisdiction of a court. The Bankruptcy Courts should apply this maxim so as to encourage the formulation of reorganization plans that incorporate consensual arrangements between plan proponents and creditors and other parties in interest. A confirmed plan is, in essence, a new contract between the debtor and all of its creditors, *In re Ernst*, 45 B.R. 700, 702 (Bankr.D.Minn.1985), and it simply reflects best on the reorganization process, the court that oversees it, and the participants in it, if this contract is a voluntary one.

This new private contract has a "global" nature, a collective effect, and a unique origin in a statutory process under the federal courts' jurisdiction. As a result, the contract, and the numerous individual arrangements it incorporates, cannot be final and binding until all of their stated conditions are met, and until the reorganizing debtor has satisfied the procedural and substantive requirements of the Bankruptcy Code and Rules. This precept has a very pointed consequence for Prudential's first argument. District Energy's agreement to accept the

---

solicited or procured in good faith or in accordance with the provisions of [the Bankruptcy Code].

3. This statute accomplishes this result via the language it highlighted as follows:

A class of claims has accepted a plan if such plan has been accepted by creditors, *other than any entity designated under [11 U.S.C. § 1126] (e)* ..., that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under [11 U.S.C. § 1126] (e) ..., that have accepted or rejected such plan.

The obvious import of this provision is that a designated ballot is not tallied for the determination of acceptance or rejection by a class.

4. In his brief and argument, Prudential's counsel hastens to assure that his client does not accuse District Energy, for its own part, of acting in bad faith at any point in the operative events.

5. This statute provides:

An acceptance or rejection of a plan may not be solicited after the commencement of the case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary of the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information. The court may approve a disclosure statement without a valuation of the debtor or an appraisal of the debtor's assets.

Debtor's plan, made post-petition but before approval of the disclosure statement, remained executory until District Energy actually filed its accepting ballot with the clerk of this Court. Neither the recitation in the disclosure statement, nor the parties' execution of the written memorandum, constituted an acceptance of the plan as such. The agreement did not purport to exempt the Debtor from its statutory obligation to present District Energy with a court-approved disclosure statement.

The resultant status of the agreement, then, is crucial: had the final, court-approved disclosure statement revealed information that materially bore on District Energy's interests, and had the Debtor previously failed to disclose that information to District Energy, District Energy would have had a right under general, nonbankruptcy law to repudiate the agreement via rescission, and then to cast a rejecting ballot. Ultimately, for the purposes of §§ 1125(b) and 1126(e), the act by which the Debtor "solicited" District Energy's vote must be deemed to have taken place after the Court approved the amended disclosure statement, and only when the Debtor's plan and disclosure statement and a ballot were actually presented to District Energy in the formal process specified by § 1125(b).

There are few reported decisions treating the interaction between §§ 1125(b) and 1126(e), and there does not appear to be a case on point. However, the court that rendered the leading decision on the permissibility of extrajudicial communications regarding the acceptance of a Chapter 11 plan has opined that the concept of " 'solicitation' must be read narrowly." *Century Glove, Inc. v. First American Bank of New York,* 860 F.2d 94, 101 (3d Cir.1988). Addressing the propriety of a creditor importuning other creditors to reject the debtor's plan via communications not approved pursuant to § 1125, the Third Circuit noted:

> The purpose of negotiations between creditors is to reach a compromise over the terms of a tentative plan. The purpose of compromise is to win acceptance for the plan. *We find no principled, predictable difference between negotiation and solici-*

*tation of future acceptances.* We therefore reject any definition of solicitation which might cause creditors to limit their negotiations.

860 F.2d at 101–102 (emphasis added).

■ To be sure, *Century Glove* involved only extrajudicial communications between creditors; too, the Third Circuit observed in passing that barring third-party creditors' extrajudicial communications-in-solicitation might provide "an unwarranted boon for the debtor." *See* 860 F.2d at 102, n. 9. However, there is no significant reason not to apply *Century Glove's* rationale to the debtor in reorganization, so as to limn the concept of "solicitation" as coeval with the formal polling process. *See also In re Texaco, Inc.,* 81 B.R. 813, 8151 (Bankr.S.D.N.Y.1988) (involving stipulation between Chapter 11 debtor and major judgment creditor, in which creditor agreed that it would not "vote for, consent to, support or participate in the formulation of" any plan other than the debtor's; concluding that execution of stipulation did not constitute either solicitation of creditor's vote for debtor's plan, or actual vote by creditor: "[t]he solicitation of [the creditor's] vote must await the approval of the [debtor's] disclosure statement ...").

Limiting the bar of § 1125(b) in this fashion avoids a chill on debtors' post-petition negotiations with their creditors, one which otherwise might prove devastating to the reorganization process. Promoting a consensual process in reorganization, in turn, will have the broader benefit of preserving the resources of both debtors and creditors; it will encourage the making of arrangements earlier in the case, it will reduce the likelihood that the plan and disclosure statement will undergo several redrafts after an initial hearing under § 1125(b), and it should thereby reduce the burden on the estate of administrative-expense claims that are incurred in connection with such redrafting.

As a matter of these basic principles, then, the Debtor's negotiations with District Energy did not constitute "solicitation" within the contemplation of § 1125. The Debtor, then, did not violate that section by obtaining District Energy's support for its plan in the way it did, and as early as it did.

Prudential's second point of contention is the Debtor's inducement of District Energy by the use of written materials that had not been previously court-approved. Strictly speaking, this complaint does not stand completely free of the first one: to the extent it was prompted by any such extraneous materials, District Energy's promise to the Debtor was as executory as it would have been in the absence of such a proffer. As to its independent substantive basis, however, the complaint is equally unavailing.

■ Some courts have held that a solicitee "may not be given information outside of . . . approved documents," those "documents" to consist of "the contents of the plan, the disclosure statement, and any other court-approved solicitation material." *In re Century Glove, Inc.*, 74 B.R. 952, 955 (Bankr.D.Del. 1987), *rev'd in this regard*, 860 F.2d at 102. *See also In re Temple Retirement Community, Inc.*, 80 B.R. 367, 368–369 (Bankr. W.D.Tex.1987). The better-reasoned decisions on the issue, however, have viewed the court-approved disclosure statement as being a mechanism for insuring a *minimum quantum* of disclosure, rather than as a court-enforced monopoly of disclosure. *Century Glove, Inc. v. First American Bank of New York*, 860 F.2d at 100 and 102; *In re Apex Oil Co.*, 111 B.R. 245, 249 (Bankr.E.D.Mo. 1990); *In re Media Central, Inc.*, 89 B.R. 685, 691 (Bankr.E.D.Tenn.1988). In the view of these courts, and of the undersigned, so long as such extrajudicial material and solicitation does not contradict the court-approved disclosure statement, or contain mischaracterizations or misstatements of material fact that might unfairly influence solicitees, a plan proponent or third party may transmit additional materials to creditors and other interested parties to induce their votes. *First American Bank of New York v. Century Glove, Inc.*, 81 B.R. 274, 279 (D.Del.1988),

*aff'd*, 860 F.2d at 101; *In re Apex Oil Co.*, 111 B.R. at 249–50.[6]

There is no evidence that the additional materials in question were false, misleading, or contradictory. No party disputes that District Energy properly and timely received the Debtor's court-approved amended disclosure statement, and relied on it when it cast its accepting ballot. The fact that the Debtor had previously provided it with other information did not violate any provision of § 1125—even if District Energy also relied on those materials in casting its ballot.

■ As its third point of contention, Prudential argues that District Energy received "special consideration" for its vote of acceptance, in the form of the Debtor's commitment to purchase at least ten more years of service from District Energy under a new HWDA. This alleged accommodation, Prudential argues, is not enjoyed by any other member of the class of unsecured creditors, and was offered and given by the Debtor in bad faith.[7]

The only caselaw authority that Prudential cites for this argument is *In re Featherworks Corp.*, 25 B.R. 634, 641 (Bankr.E.D.N.Y. 1982), *aff'd*, 36 B.R. 460 (E.D.N.Y.1984). Though the general rationale adopted by the Bankruptcy Court in *Featherworks* is sound, the citation is inapposite. In that case, an individual person controlled the debtor, its parent company, and the parent of its parent company. Well into the proceedings on confirmation of the debtor's plan, that individual paid a creditor the sum of $25,000.00, as part of a general agreement in which the debtor's control person received an assignment of certain accounts receivable and a general release from the creditor, and the creditor agreed to change his previously-cast ballot of rejection to a ballot accepting the debtor's plan. Unlike in the present case, however, the soliciting party's pre-petition duties and

---

6. Of course, as noted by the *Media Central* court, . . . pitfalls may still await those parties who solicit votes on the basis of information not contained in a court-approved disclosure statement. . . . Failure to obtain beforehand a judicial ruling on the propriety of statements or information sent in conjunction with a vote solicitation may lead to a vote disqualification after the fact if it is later determined that the

statements or information were improper and the solicitation in bad faith. 89 B.R. at 691.

7. In spite of counsel's assurances, this argument impugns District Energy's motives to some extent; the insinuation, subtle though it may be, is that District Energy snapped up this offer without the indicia of good faith.

the solicitee's pre-petition rights and post-petition participation in the case arose solely out of the relationship of debtor and creditor. The Bankruptcy Court, then, had to conclude that the act of the debtor's control person in literally purchasing the change of the creditor's vote so tainted the final vote as to compel designation under § 1126(e).[8]

Here, by contrast, the solicitee had two very different roles in this case. District Energy had a right to payment from the Debtor on account of an unpaid pre-petition bill for service. This gave rise to an allowable unsecured claim [9] in its favor, and made it a creditor [10] of the debtor. In this broad respect, perhaps, District Energy was no different from the creditor in question in *Featherworks*. Beyond this, however, District Energy and the Debtor were parties to a long-term executory contract—an agreement that, in the Debtor's estimation, contributed to the growing unprofitability of its operations. This was a separate legal relationship as to which the Bankruptcy Code

gave the Debtor a significant remedy.[11] Were the Debtor to have exercised this remedy, District Energy could have asserted an additional very large unsecured claim [12] against the Debtor and the bankruptcy estate, in the amount of the damages it would have suffered consequent to the breach that would have been deemed to have occurred upon the Debtor's rejection of the 1982 HWDA.[13]

After the Debtor went into Chapter 11, it had to cope with the near-certainty that District Energy would assert its rights under both of these roles. Its response does not offend any provision of Chapter 11 that goes to disclosure, solicitation, or confirmation requirements. Neither the structure nor the spirit of the agreement evidences any "special consideration" to District Energy in its role *as unsecured creditor*. To be sure, its unsecured claim on account of pre-petition service is to be allowed in the amount asserted. There is no evidence of record that the

8. The *Featherworks* court's phraseology, however, is a little unfortunate:

> ... if any creditor receives some special consideration peculiar to him, his vote is no longer disinterested and unbiased and the Code's built-in controls are neutralized.

25 B.R. at 641. This characterization does not jibe with the more accurate recognition earlier in the same paragraph:

> The Code depends upon the self-interest of the creditors to act as a barrier against abuse of the bankruptcy laws.

*Id.* In at least a general sense, the statutory framework for plan confirmation is a very Madisonian construct: it is premised on the assumption that debtors, creditors, and interestholders will all act in their own interest in their participation in a reorganization case. *See In re Applegate Property, Ltd.,* 133 B.R. 827, 834 (Bankr. W.D.Tex.1991) ("... good faith voting and solicitation does not demand selfless disinterest ..."). The Code attempts to channel that self-interest toward a substantive result that is least destructive of the options of all of the constituencies in a Chapter 11 case, through a process that minimizes disruption and conflict during the reordering of all parties' rights.

9. 11 U.S.C. § 101(5) broadly defines "claim" as "right to payment ..."

10. 11 U.S.C. § 101(10) includes, as its exemplars of "creditor," "entity that has a claim against the debtor that arose ... before" the debtor's bankruptcy filing.

11. The remedy, of course, was the power, "subject to the court's approval, [to] assume any executory contract or unexpired lease ..." 11 U.S.C. § 365(a).

12. In its response to the motion at bar, District Energy alleges, somewhat summarily, that the amount of this claim would be $4,689,160.00. Affidavit of Rudy Brynolfson, District Energy's Vice President for Finance and Marketing, at ¶ 6 (filed on April 30, 1993). At the very least, District Energy estimates it will incur out-of-pocket loss of revenues in the sum of $1,401,-591.00, as a result of the Debtor's rejection of the 1982 HWDA and the execution of a new HWDA. *Id.* at ¶ 11.

13. Such a claim arises by operation of 11 U.S.C. 365(g), which provides that

> ... the rejection of an ... unexpired lease of the debtor constitutes a breach of such ... lease—
> (1) if such ... lease has not been assumed ..., immediately before the date of the filing of the [bankruptcy] petition....,

as well as 11 U.S.C. § 502(g):

> A claim arising from the rejection, under [11 U.S.C. §] 365 ... of an ... unexpired lease of the debtor that has not been assumed shall be determined, and shall be allowed ... or disallowed ..., the same as if such claim had arisen before the date of filing of the [bankruptcy] petition.

*See, in general, In re Modern Textile, Inc.,* 900 F.2d 1184, 1191 (8th Cir.1990).

Debtor is not obligated for this amount. As to its unquestionable status as a creditor, then, District Energy is receiving only that to which it is entitled.

As to the working-out of District Energy's other role, the "special consideration" under the agreement runs entirely in favor of the Debtor. District Energy apparently has waived the full amount of its claim under §§ 365(a), 365(g), and 502(g); it will not contest the rejection of the HWDA; and it will give the Debtor the significant cost-benefit of entry into a new HWDA with terms in line with current customer expectations within District Energy's market.[14] The only identifiable benefit that District Energy will receive is the Debtor's continued patronage for another ten years, as an alternative to losing this customer to another provider of energy for heating. This sole, and rather limited, concession inures to District Energy solely in its role as a party to an executory contract. The complex of trade-offs as to that contract was comprehensive, and fully in line with what might reasonably be expected to result from the parties' respective economic and legal postures.

Clearly, then, neither District Energy nor the Debtor can be deemed to have negotiated District Energy's acceptance in bad faith.

Prudential's final argument, which it raises in the alternative, is that the Debtor's rejection of the 1982 HWDA and the proposed entry into a new one is a sham transaction, amounting solely to a reduction in the duration of the contract without any immediate financial benefit to the Debtor. As a result, Prudential argues, this was a transaction that could not and would not give rise to an allowable claim for damages under §§ 365 and 502(g). As is obvious from the earlier discussion, the Debtor does have an immediate financial benefit from the agreement—at least two years' worth of "demand discount" in heating rates. This reduction in the charges that otherwise would be made under the 1982 HWDA is a large one.[15] Rather than being a sham thrown up to create the

semblance of an exchange of consideration, the agreement embodies a very real accommodation of interests on the part of both of the parties to it. It certainly is not a mark of bad faith on the part of either of them.

IT IS THEREFORE ORDERED that Prudential's motion for an order designating the ballot of District Energy pursuant to 11 U.S.C. § 1126(e), and omitting it pursuant to 11 U.S.C. § 1126(c) from the tally of votes under Class III of the Debtor's plan, is denied in all respects.

---

14. The record suggests that the Debtor is receiving the same contract that would be granted to a brand-new customer, or to one whose HWDA were expiring pursuant to its terms.

15. Testimony during the hearing on confirmation indicated savings of $160,000.00 to $170,000.00 per year.